USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 94-1382 No. 94-1456 XEROX FINANCIAL SERVICES LIFE INSURANCE COMPANY, ET AL., Plaintiffs, Appellees, v. HIGH PLAINS LIMITED PARTNERSHIP, ALLIED FIRST CLASS PARTNERS, INC., ALLIED PROGRAMS CORPORATION, M.S. STERMAN & ASSOCIATES, and THE MAYFLOWER GROUP, LTD., ET AL., Defendants, Appellees. __________ MARSHALL S. STERMAN, Defendant, Appellant. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Rya W. Zobel, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Boudin, Circuit Judge, _____________ and Barbadoro,* District Judge. ______________ ____________________ George W. Mykulak with whom Louis J. Scerra, Richard M. Gilbert __________________ ________________ __________________ and Goldstein & Manello, P.C. were on briefs for appellant. _________________________ J. Timothy Eaton with whom Michael W. Coffield, Theodore S. _________________ ____________________ ____________ Harman, Coffield Ungaretti & Harris, John J. Curtin, Jr., Patricia J. ______ ___________________________ ___________________ ___________ Hill, Daniel S. Savrin and Bingham, Dana & Gould were on brief for ____ _________________ ______________________ plaintiffs. ____________________ January 17, 1995 ____________________ ____________________ *Of the District of New Hampshire, sitting by designation. BOUDIN, Circuit Judge. This appeal has its origin in a _____________ settlement agreement that purported to resolve the claims and counterclaims of approximately a dozen corporations, partnerships, and other business entities in at least four separate lawsuits. The settlement went awry; and one side sought to enforce consent judgments filed as part of the settlement. The subject of those judgments sought to undo them and now appeals from the district court's denial of his efforts. I. THE HISTORY The appellant Marshall S. Sterman ("Sterman") and his now- deceased partner Lester Grant owned or controlled a number of business entities ("the Sterman entities") that engaged in real estate development projects in a number of states in the late 1980s and early 1990s. To finance these projects, the Sterman entities entered into transactions with appellee Xerox Financial Services Life Insurance Company and appellee Van Kampen Merritt, Inc. and related companies (collectively, "Xerox-VKM"). Xerox-VKM provided financing to the Sterman entities in exchange for security interests in the real estate and in bonds related to the development projects. The Sterman entities allegedly defaulted on certain of their obligations relating to at least three projects, and a succession of lawsuits began. The first suit was brought -2- -2- against the Sterman entities by Xerox-VKM in Illinois federal district court on February 27, 1992, and related to a Pennsylvania hotels development project.1 A second transaction involved a hotel in Colorado; a Sterman entity had agreed to repurchase bonds from Xerox-VKM and Sterman had personally guaranteed the obligation. When the repurchase did not occur, Xerox-VKM filed two lawsuits. The first of those two lawsuits was brought against the Sterman entities in the same Illinois court as the Pennsylvania hotels lawsuit on March 13, 1992.2 The other concerned Sterman's own guaranty which contained an arbitration clause; Sterman was domiciled in Massachusetts and, to compel arbitration, Xerox-VKM brought suit against him personally in the federal district court in Massachusetts on May 4, 1992.3 In this action Sterman failed to respond to the complaint and the court entered a default order against him. The three suits just described are the centerpiece of the present litigation but are not an exhaustive list of the disputes between the parties. Xerox-VKM brought yet another  ____________________ 1Van Kampen Merritt, Inc. v. Pilgrim Financial Servs., _________________________ __________________________ Inc., No. 92-C-1476 (N.D. Ill.).  ____ 2Xerox Financial Servs. Life Ins. Co. v. Mayflower ________________________________________ _________ Group, Ltd., No. 92-C-1809 (N.D. Ill.). __________ 3Xerox Financial Servs. Life Ins. Co. v. Sterman, No. ______________________________________ _______ 92-11029-Z (D. Mass.). -3- -3- lawsuit against the Sterman entities in New Mexico relating to a nursing home development in that state. In several of the lawsuits, the Sterman entities filed counterclaims. In addition, several other transactions between the parties had gone wrong and were the subject of litigation- and workout- related discussions between the parties. Against this background, in May 1992 the parties negotiated a global settlement agreement to resolve all pending and a host of potential lawsuits. The agreement, signed on May 19, 1993, was a lengthy document stipulating that it would be governed by Illinois substantive law. The parties agreed to execute mutual releases. The Sterman entities agreed to transfer their interests in several properties to Xerox-VKM; these were apparently properties in which Xerox-VKM had security interests but for which they wanted clear title. Sterman personally agreed to pay Xerox- VKM $125,000 in 60 days--July 19, 1993--and to execute a note for four more annual installments in the same amount. In return, Xerox-VKM agreed that, in addition to releasing the Sterman entities from various claims, Sterman himself could within 60 days repurchase from Xerox-VKM certain bonds he had originally sold them relating to a development in Brush, Colorado ("the Brush bonds"). The bonds were priced at nearly $5 million but Sterman apparently calculated that he could buy them at the stipulated price and -4- -4- then resell them for a profit of more than $450,000. The bond repurchase was proposed by Sterman as part of the settlement but the terms were contained in a separate agreement. The settlement agreement contained a back-up enforcement mechanism that is the center of this appeal. Sterman agreed to the entry of a consent judgment against him personally in one of the Illinois actions (concerning the Pennsylvania hotels) and in the Massachusetts action (concerning the Colorado hotel); but the settlement agreement provided that Xerox-VKM would not enforce either judgment so long as Sterman complied with his obligations under the settlement agreement. Motions for entry of the consent judgments noted this condition. Pursuant to the settlement agreement, the parties made the property transfers from the Sterman entities to Xerox-VKM on May 19, 1993, coincident with the signing of the agreement. On June 7, 1993, the consent judgment against Sterman and in favor of Xerox-VKM was entered in the pending Massachusetts case in the amount of about $2.3 million; and on June 9, 1993, a similar judgment was entered in the amount of about $3.5 million in the original Illinois action. On -5- -5- July 15, 1993, Xerox-VKM registered the Illinois judgment in Massachusetts. 28 U.S.C. 1963.4 All that remained was for Sterman to purchase the Brush bonds by the July 19 closing date and to make the $125,000 payment on that date, leaving Xerox-VKM with the note to cover four more installments. Sterman was unable to purchase the bonds or pay the first installment on July 19. It appears that he had more difficulty arranging in advance to resell the bonds than he had expected and that he had planned to use the profits on the resale of the bonds to pay the first installment. Xerox-VKM refused Sterman's request for a delay of two months and began steps to collect on their judgments in Massachusetts. Although Sterman resided in Beverly, Massachusetts, apparently there was a scarcity of assets held in his own name. Xerox-VKM thus initiated so-called attachments on trustee process directed at a number of business interests in Massachusetts. This procedure is used under Massachusetts state court rules primarily to attach interests in the hands of a third party that are owed to or indirectly owned by a judgment debtor; and the procedure is available to judgment creditors in Massachusetts federal courts. See Fed. R. Civ. ___ P. 64; Mass. R. Civ. P. 4.2.  ____________________ 4Van Kampen Merritt, Inc. v. Sterman, No. 93-MC-10542 _________________________ _______ (D. Mass.). -6- -6- Xerox-VKM filed motions to initiate the attachments in both the Massachusetts dockets: the original Massachusetts consent judgment and the new docket that reflected the registration of the Illinois consent judgment. Judge Zobel presided over both cases and eventually consolidated them, so we discuss the proceedings without differentiating between the two dockets. The original motion to initiate the attachments ex parte was filed on August 12, 1993, and _________ allowed almost immediately. On October 20, 1993, Sterman filed a motion captioned as one "to dissolve trustee process and for other equitable relief." In substance, Sterman claimed that he had not breached the settlement agreement, and that even if he had, the fault lay with Xerox-VKM. Alternatively, he said that Xerox-VKM had to give him credit for the value of the properties transferred on May 19, 1993, and that it was an impermissible penalty for Xerox-VKM to collect almost $6 million in judgments for Sterman's failure to pay a $125,000 debt. After briefing and argument, Judge Zobel denied the motion. Sterman did not seek to appeal. Proceedings continued to implement the attachments, including discovery directed against the putative "trustees" who Xerox-VKM thought owed money to Sterman or held interests owned by him. Then on February 1, 1994, Sterman filed a new motion captioned as one "to modify judgment amounts or for -7- -7- entry of satisfaction of judgment or for accounting and for stay." This motion repeated in detail the penalty and credit-for-previously-transferred-property claims made in the November motion; in a footnote the new motion also sought to incorporate the old one by reference. After briefing and argument, Judge Zobel denied the motion on February 25, 1994. In a memorandum and order Judge Zobel said that Sterman had breached the settlement agreement by failing to make the promised $125,000 payment and Xerox-VKM was therefore entitled to enforce the judgments. Further, Judge Zobel concluded that Sterman "has used a variety of means to obstruct collection of this debt"; and for this reason Judge Zobel granted Xerox-VKM's recently filed "emergency motion for further injunctive relief" under Fed. R. Civ. P. 65(b). The order enjoined Sterman, and others under his control or in concert with him, from concealing or otherwise disposing of any interest held by or due to Sterman. Sterman filed a timely notice of appeal from the new order, entered February 25, 1994, and it is that appeal that is now before us. Judge Zobel's order also provided that discovery should be completed by the end of May 1994 and a further conference was scheduled for June 1994. However, the briefs are silent as to what developments, if any, have -8- -8- occurred in the district court since the order now sought to be appealed. II. THE ISSUES 1. The first question concerns our jurisdiction, and a related claim of waiver raised by Xerox-VKM. The district court's order was in part an explicit preliminary injunction; such injunctions can be appealed immediately, 28 U.S.C. 1292(a)(1), and Sterman's appeal was filed within the requisite period. But, argues Xerox-VKM, this should not give Sterman a right to relitigate issues on appeal that he raised by motion in October 1993, lost in the district court, and chose then not to appeal. According to Xerox-VKM, Sterman has "waived" his right to review of the district court's rejection of his attacks on the judgments. These, of course, are the only issues that Sterman wants to litigate on this appeal. We regard both of Sterman's motions in the district court as in substance motions under Fed. R. Civ. P. 60(b) to set aside final judgments. In form the consent judgments were both final judgments; the principal relief sought in Sterman's two motions was effectively to set aside the judgments; and the arguments made in the motions concerned the validity and enforceability of the judgments rather than the technicalities of trustee process. Apparently both sides share this view. -9- -9- Ordinarily the denial of a Rule 60(b) motion is immediately appealable since there is nothing left to do in the district court. See, e.g., FDIC v. Ramirez Rivera, 869 ___ ____ ____ _______________ F.2d 624, 626 (1st Cir. 1989). Here neither denial of Rule 60(b) relief ended the proceedings; they were ongoing at the time of both orders and so far as we know continue today. This raises interesting questions about the appealability of a Rule 60(b) denial in the context of an ongoing district court proceeding. See 15B C. Wright & A. Miller, Federal ___ _______ Practice and Procedure 3916, at 363 (2d ed. 1992) ________________________ ("[Appeal] may be denied if the motion seems bound up with other proceedings that remain to be concluded."). In our view it is sufficient that as part of its February order the district court entered a preliminary injunction in aid of enforcement of the judgments. The preliminary injunction is immediately appealable and is itself colorably dependent on the denial of motions to vacate the judgments. "Our jurisdiction embraces a consideration of such questions as are basic to and underlie the order supporting the appeal." Alloyd Gen. Corp. v. Building __________________ ________ Leasing Corp., 361 F.2d 359, 363 (1st Cir. 1966). Certainly ______________ the district court would not have continued the enforcement proceedings if it had agreed that the judgments deserved to be set aside. -10- -10- This brings us to Xerox-VKM's waiver argument. The analogy it offers is to one who, having suffered an adverse judgment, seeks to set it aside under Rule 60(b); fails; does not appeal; and then, when the time for appealing has passed, renews the very same arguments in a new motion under Rule 60(b) and then seeks to appeal the new denial. In Burnside ________ v. Eastern Airlines, 519 F.2d 1127 (5th Cir. 1975), cited to ________________ us by Xerox-VKM, the court held that the moving party could not effectively pursue an out of time appeal by the expedient of renewing the same motion later on. The difficulty with the analogy is that even if the October and February motions are treated as raising the same arguments, although with different emphases, it is by no means clear that Sterman could have appealed the denial of the October motion. At that time, there was no grant of a preliminary injunction as the vehicle for an immediate appeal. Xerox-VKM gives us no reason or precedent to show that such an appeal was possible. If an appeal was not possible, the waiver argument is pretty lame. In these somewhat unusual circumstances, we think that the proper course is to reject the waiver argument and to treat Sterman's claims as sufficiently related to the clearly appealable injunction to justify our consideration of them on the merits. Since we think that the claims fail on the merits, it is enough to assume arguendo that the waiver and ________ -11- -11- relatedness points are resolved in Sterman's favor. See, ___ e.g., Rhode Island Hosp. Trust Nat'l Bank v. Howard ____ __________________________________________ ______ Communications Corp., 980 F.2d 823, 829 (1st Cir. 1992) _____________________ (avoiding difficult jurisdictional issue to resolve merits of interlocutory appeal). 2. We turn now to the main arguments raised in Sterman's February motion under Rule 60(b). The consent judgments are on their face unqualified final judgments against Sterman, totally almost $6 million. Still, under the settlement agreement the enforcement of the final judgments was made contingent on Sterman's breach of the agreement. Had Sterman complied with the agreement, Sterman would be entitled to some form of protection--we need not decide what kind. But despite Sterman's original claim to have complied, it is undisputed that he did not pay the $125,000 promised by July 19 as provided in the written agreement. Sterman might still obtain relief by an affirmative showing of grounds sufficient to persuade a district court to exercise its authority under Rule 60(b) to set aside the judgments.5 Rule 60(b) needs to be emphasized because, while Rule 60(b) relief is not wholly a matter of discretion,  ____________________ 5How far the Massachusetts district court had authority to set aside the Illinois judgment is a debatable point, see ___ Carteret Sav. & Loan Ass'n v. Jackson, 812 F.2d 36, 39 (1st ___________________________ _______ Cir. 1987); Indian Head Nat'l Bank v. Brunelle, 689 F.2d 245, ______________________ ________ 249-51 (1st Cir. 1982); see also 11 Wright & Miller, supra,  ________ _____ 2865, at 224 (1st ed. 1973), but one that need not be resolved in view of our disposition of the merits. -12- -12- relief from a final judgment is "extraordinary"; discretion plays a role; and neither the grounds nor the procedures are as rigidly prescribed as those that would attend an ordinary lawsuit seeking a judgment in the first instance. Vasapolli _________ v. Rostoff, 39 F.3d 27, 37 n.8 (1st Cir. 1994). _______ Against this background, we consider first Sterman's argument that the judgments represent a contract "penalty" forbidden by Illinois law, in view of the supposed disproportion between the $125,000 immediately owed and the almost $6 million sought to be collected under the judgments. The parties appear to treat Illinois law as controlling on this point because of the stipulation in the settlement agreement. They are arguably mistaken (for reasons explained below) but state law is pertinent by analogy and Illinois is a perfectly good example. Illinois does refuse to enforce penalties in contracts, see, e.g., Lake River Corp. v. Carborundum Co., 769 F.2d ___ ____ _________________ ________________ 1284, 1288-91 (7th Cir. 1985); Bauer v. Sawyer, 134 N.E.2d _____ ______ 329, 333-34 (Ill. 1956), but the rule may have little to do with final judgments. Indeed, even a contract agreeing to settle a pending or threatened suit--technically, a contract of "accord" --may be enforceable despite claims that it constitutes a penalty. Williston says that the penalty defense is not available in such cases; and the sparse case law is divided, weighted slightly in favor of Williston. See ___ -13- -13- generally 5 Williston, Contracts 780, at 700-01 (3d ed. _________ _________ 1961).6 The rationale for the rule against enforcing penalties in contract cases is not crystal clear. But it is not hard to imagine why a court might be loath to enforce a contract provision specifying a disproportionately large sum--which courts call a penalty--for breach of the contract. The parties may make such an agreement far in advance of the dispute and may not appreciate the full impact if the unlikely breach does occur. Contract damages, broadly speaking, aim at compensation, not at punishment. Finally, courts do not like results that appear unjust. See Lake ___ ____ River, 769 F.2d at 1288-91. _____ The force of such concerns is lessened where one is dealing with a contract of accord that is entered into after _____ the dispute has arisen. At this point, the parties are focusing on the strength of the claims, the likely damages and the costs of litigating. If the defendant, or potential defendant, now consents to judgment in a specific amount, it  ____________________ 6Compare Resolution Trust Corp. v. Avon Ctr. Holdings, _______ ______________________ ___________________ Inc., 832 P.2d 1073, 1075 (Colo. Ct. App. 1992) (holding that ____ the penalty analysis is inappropriate); (Crosby Forrest _______________ Products, Inc. v. Byers, 623 So.2d 565, 568 (Fla. Dist. Ct. ______________ _____ App. 1993) (same); Security Pacific Nat'l Bank v. Roulette, ____________________________ ________ 492 N.E.2d 438, 441 (Ohio 1986) (same), with Sybron Corp. v. ____ ____________ Clark Hosp. Supply Corp., 143 Cal. Rptr. 306, 310 (Cal. Ct. ________________________ App. 1978) (finding an unenforceable penalty); Aubrey v. ______ Angel Enters., Inc., 717 P.2d 313, 315 (Wash. Ct. App. 1986) ____________________ (same). See generally 5 Williston, Contracts 780, at 700- _____________ _________ 01 (3d ed. 1961). -14- -14- is ordinarily done with eyes wide open, and in large matters usually with legal advice. These attitudes seem to underlie the Williston view that the defendant should be constrained in attacking his own settlement. Courts that share this view may also feel that the plaintiff, who in settlement often accepts less than is claimed, ought not then be forced to litigate anew about the propriety of the discounted amount. After all, the settlement may be attractive just because it assures that litigation about liability and amounts is over. If this view is taken of a contract in accord, one would expect the same considerations to apply several times over to insulate from penalty defenses a court-entered consent judgment, which is one step further down the line (and a very important step). The present case is somewhat different from an ordinary consent judgment since Sterman's consent judgments, although final in form, were contingent as to enforcement on a default by Sterman. In that sense the analogy to a contract in accord may be a good one. We have found no Illinois state decisions on whether the penalty defense applies to contracts of accord.7 To the extent we were forced to guess at what  ____________________ 7Two federal decisions cited to us assume without discussion that Illinois would apply its penalty analysis to a settlement agreement. Justine Realty Co. v. American Nat. ___________________ _____________ Can Co., 976 F.2d 385 (8th Cir. 1992), Yockey v. Horn, 880 ________ ______ ____ F.2d 945 (7th Cir. 1989). But neither decision considers the possible distinction between ordinary contracts and contracts of accord. -15- -15- Illinois law might be, we would incline toward following the Williston view that something far more than a showing of "penalty" is needed to defeat an obligation expressly assumed to settle a pending or threatened law suit. What is more, we are not concerned here directly with a contract suit governed by Illinois law but with a motion to reopen a federal judgment under Rule 60(b). While state law on contracts is very instructive--that is why we have discussed it--"[t]he grounds and the procedure for setting aside a federal judgment are entirely a matter of federal law, on which state law may be disregarded." 11 Wright & Miller, supra, 2353, at 147-48; see also Johnson Chemical _____ _________ ________________ Co. v. Condado Center, Inc., 453 F.2d 1044, 1046 (1st Cir. ___ ____________________ 1972). Even if Illinois did regard a contract in accord as subject to a penalty defense, it is debatable whether the district court would have been forced to use the same standard in deciding whether to reopen. In all events, there is no showing that enforcement of the judgments involves a penalty. This case does not involve in isolation the collection of $6 million for failure to pay a $125,000 debt. Any judgment about disproportion would depend on the reasonable magnitude of all of the claims settled by the May 19 settlement and all of the benefits  ____________________ -16- -16- received by Xerox-VKM. The settlement covered four lawsuits, three projects, and a substantial number of claims and counterclaims. Xerox-VKM may well receive less than it was originally entitled to even if it collects the $6 million in judgments and keeps or collects everything else that it was ___ given or promised under the settlement. Even if the penalty defense were available, it was Sterman's burden to make a colorable showing of overall disproportion through affidavits before the district court needed even consider taking the claim seriously. His jumble of assertions and conclusions does not even begin to make such a showing. Xerox-VKM appears to assert that even collection of the full judgment will not make them whole but this is beside the point. What they bargained for in the settlement included the right not to have to prove the actual ___ amount of their claims. Instead, Sterman now has them arguing about the matter. This discussion also disposes of Sterman's related claim that he ought to receive "credit" against the judgments for the value of assets transferred on May 19. At first glance, this might seem to be a straightforward suggestion that the defendant suffered a judgment, paid part of it, and should naturally be held to owe only the unpaid balance. When one understands what Sterman is actually saying, his claim is -17- -17- seen to depend on the same kind of false comparison as his penalty argument. Nothing in the settlement agreement suggests that the amounts specified in the consent judgments are to be reduced by the assets transferred on the same day as the agreement was signed and well before the judgments were even entered. So far as we know, the transfers may themselves may be nothing more than the clearing of title to assets already held by Xerox-VKM as security. And while such security if realized would probably reduce liability, Sterman has (as noted) provided us with nothing to suggest that Xerox-VKM has or ever will collect as much as they might have done if the Sterman entities had compliedwith their original commitments. 3. This disposes of the arguments made by Sterman in his February motion, but he also seeks to brief in this court additional arguments made in his October motion. Pertinently, he claims that parol agreements, both before and after the May 19 agreement, made Sterman's payment of the $125,000 contingent on his ability to resell the Brush bonds and provided that the July 19 closing date would be extended upon Sterman's request. For reasons already set forth, we think that these claims have arguably been preserved. At the oral argument on the October motion, Judge Zobel brushed aside the Sterman's claim that Xerox-VKM had from the outset orally agreed to such a linkage or a right of Sterman -18- -18- to extend at will. Her ruling was understandable: the May 19 agreement was a complex, lawyer-crafted, written document and it made no mention of any such linkage or right; on the contrary, it said that time was of the essence, adding only that the parties could agree to extend the closing date.  _____ Under parol evidence rules, followed in Illinois as elsewhere, evidence of an alleged "prior or contemporaneous agreement[]" is inadmissible if "it would have been normal for the parties to incorporate [such an agreement] in the written instrument . . . ." Roth v. Meeker, 389 N.E.2d ____ ______ 1248, 1256 (Ill. App. Ct.. 1979). In this case, the parol evidence rule applies with full force. Once again, it does not matter whether Illinois law governs the decision under Rule 60(b) whether to reopen the judgments, for it is at least instructive by analogy. But the parol evidence rule generally governs only prior or contemporaneous agreements. Thus: [I]t does not bar evidence of subsequent negotiations to show modification of the contract. Even a completely integrated agreement can therefore be modified or rescinded orally, subject, of course, to the doctrine of consideration and the statute of frauds. In a few states, legislation requires a writing for the modification or rescission of a written instrument. A. Farnsworth, Contracts 7.6, at 492 (1990) (footnotes omitted); accord A.W. Wendell & Sons, Inc. v. Oazi, 626 ______ ___________________________ ____ N.E.2d 280, 287 (Ill. 1994) ("Under Illinois law, parties to -19- -19- a written contract may alter or modify its terms by a subsequent oral agreement . . . ."). Xerox-VKM has not troubled to address Sterman's modification claim (except by asserting that the claim has been waived). Still, "[t]he court need not hold a hearing on a motion for relief from judgment if the motion is clearly without substance . . . ." 11 Wright & Miller, supra,  _____ 2865, at 227. We think that there is more than enough in the record to make clear that Sterman's claim is without merit and that no evidentiary hearing was needed to establish this point (it was the subject of oral argument). A close reading of Sterman's affidavits--one from him and another from his broker--show that neither provides any basis for believing that the parties reached an agreement, after the original May 19 document was signed, purporting to _____ extend the closing date or to condition the closing on Sterman's resale of the Brush bonds. Further, between May 19 and the scheduled closing date, Xerox-VKM twice wrote to Sterman to reconfirm his remaining obligations; neither letter evidenced any flexibility on the date and one explicitly reminded Sterman that he would be in default if he failed to fulfill his obligations by July 19. Finally, on July 19 Sterman himself faxed a letter to a Xerox-VKM representative requesting an extension of the closing date. He made no claim that Xerox-VKM had agreed to -20- -20- extend the closing date or that he had any unilateral right to an extension. Far from granting an extension, Xerox-VKM wrote to Sterman the next day informing him that he had defaulted on his payment obligation, that the judgments against him could now be executed, and that his opportunity to purchase the Brush bonds had now expired. Three days later Sterman again sought an extension, and Xerox-VKM immediately refused. In sum, despite references in his brief to a supposed post-May 19 modification in the settlement agreement, there is no substantial basis for such a claim, and it is contradicted by Sterman's own correspondence. Under these circumstances, we think that there is no reason to take the claim seriously. Xerox-VKM's motion to supplement the record by inclusion of a previously omitted exhibit page is granted. The _______ judgment is affirmed. ________ -21- -21-