Augustine **GUYTHER,** et al., Plaintiffs,

v.

**DEPARTMENT OF LABOR FEDERAL CREDIT UNION, et al., Defendants.**

**No. CIV.A. 00–2746(JR).**

United States District Court,
District of Columbia.

March 8, 2002.

Sharon Fast Gustafson, Arlington, VA, Counsel for Plaintiffs.

E. Joseph Nealon, Kirsten E. Keating, Ballard Spahr Andrews & Ingersoll, LLP, Washington, DC, Counsel for Defendants.

### MEMORANDUM

ROBERTSON, District Judge.

Plaintiffs are former employees, or beneficiaries of deceased former employees, of the Department of Labor Federal Credit Union. In this suit, they accuse the Credit Union and certain of its officers of breaching fiduciary duties and violating the Employee Retirement Income Security Act (ERISA) in the operation of a retirement pension benefit plan between 1982 and 1998. The parties have filed cross motions for partial summary judgment, and the plaintiffs have moved for leave to amend their complaint a second time to add a new ERISA claim. For the reasons set forth below, defendants' motion for partial summary judgment will be granted, and both of plaintiffs' motions will be denied.

### Background

Target benefit plans require a minimum annual contribution (the "target" contribution) calculated to yield a defined benefit at retirement. Augustine Guyther, Paula Johnson Meadows, Neomi Bane (now deceased), and June Johnson enrolled in the Credit Union's Target Benefit Plan when it was inaugurated on April 1, 1982, and made contributions for the duration of their employment.[1] Over the years, the Credit Union executed three sets of retro-active amendments. A 1985 plan agreement was approved on January 30, 1986. A 1989 plan agreement and a 1996 plan agreement were approved in August 1998.

The plan appears to have been the subject of sporadic employee complaints and a formal union grievance about failure to provide documentation and other procedural irregularities. Four employees eventually filed a civil complaint in this Court in 1998, *Santos v. Department of Labor Federal Credit Union*, No. 98–2982, and found materials in discovery (including reports by the Credit Union's own pension consultant and insurance agency) suggesting that the Credit Union was not making required contributions for all employees. That case settled.

After *Santos*, the plaintiffs in the current case requested an itemization of their contributions and payments to make up for claimed deficiencies. The Credit Union reviewed their claims and denied the requests. The plaintiffs then filed this suit, asserting breach of fiduciary duty against the Credit Union and Plan and breach of co-fiduciary duty against three named individual trustees and additional others unknown. They seek equitable relief in the form of an accounting and the appointment of an actuary, and they demand that the Credit Union make up for deficiencies in the amount of contributions that they assert should have been made under the terms of the plan.

The defendants responded initially by moving to dismiss for the plaintiffs' failure to exhaust their claims administratively. *Communications Workers of Am. v. AT & T Co.*, 40 F.3d 426, 429, 431 (D.C.Cir.1994). The plaintiffs then moved for partial sum-

---

[1] Augustine Guyther and Paula Johnson Meadows stopped working at the Credit Union in February 1992. Neomi Bane (who is represented by her sister Louise Pierson) finished in May 1997. June Johnson retired in December 1998. Because all plaintiffs except

Ms. Johnson had ceased working for the Credit Union before the 1989 and 1996 agreements were approved, most of their benefits accrued under the 1982 and 1985 agreements.

mary judgment on liability and for equitable relief (an accounting and the appointment of an actuary) to assist in further proceedings, and the defendants cross-moved for partial summary judgment. Consideration of those motions was stayed while plaintiffs pursued administrative appeals, which they exhausted in the spring and summer of 2001.

### Analysis

## I. Cross–Motions for Partial Summary Judgment

The Credit Union's Target Benefit Plan has always required employees to contribute 3% of their annual compensation to participate. Def. Ex. D at 1 (1982 plan); Def. Ex. E at 1 (1982 plan); Pl.Ex. 70 at 5 (1982 plan); Def. Ex. A at 12 (1985 plan); Def. Ex. B at 28 (1989 plan); Def. Ex. C at 31 (1996 plan). The core dispute in this case is whether those mandatory employee contributions are to be applied toward the annual target contribution, or whether the Credit Union is required under the plan agreements to pay the full target amount itself. The Credit Union has applied employees' 3% mandatory contributions toward the target contribution for twenty years, contributing its own money only where the 3% was insufficient to meet the target amount. The plaintiffs argue that this practice was impermissible under the 1982 and 1985 plan agreements and therefore that the defendants have violated 29 U.S.C. § 1054(g) by reducing accrued benefits and 29 U.S.C. § 1104 by discharging their duties in a way that benefits the Credit Union rather than acting for the sole benefit of participants and beneficiaries.

### A. 1982 Plan

Resolution of the dispute about the 1982 plan agreement requires construction of the terms of a contract that neither party has been able to locate. The best evidence of the 1982 plan's provisions appears to be the 1982 and 1984 summary plan descriptions (SPDs) and a 1982 adoption agreement between the Credit Union and Travelers Insurance Company. SPDs often control over conflicting language in plan agreements anyway, because (it is thought) employees actually read the summaries. *Mathews v. Sears Pension Plan,* 144 F.3d 461, 466 (7th Cir.1998); *Chiles v. Ceridian Corp.,* 95 F.3d 1505, 1518–19 (10th Cir.1996). Thus, even if the SPDs were not actually distributed to Credit Union employees in this case—an issue that is hotly disputed by the parties—they are still the best contemporaneous evidence of the terms of the contract and structure of the plan.[2]

■ The absence of the 1982 plan agreement creates a second problem. The Credit Union's entire approach to this case is predicated on the assumption that its interpretations are entitled to deference under the terms of the plan agreements. It is true that the 1985 agreement authorizes the Credit Union to determine eligibility for benefits and to construe the terms of the plan in its capacity as Plan Administrator, Def. Ex. A at 7, § 3.02; *see Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 111–15, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), but the 1982 and 1984 SPDs and the adoption agreement do not specify the scope of the Credit Union's authority as administrator under the 1982 plan agreement. Def. Ex. D at 2; Def. Ex. E at 2. I am unwilling to accord deference to the Credit Union's interpretation of the 1982 plan in the absence of evidence of the Credit Union's authority to construe contract terms. *Cf. Firestone,* 489 U.S. at

---

2. Plaintiffs' reliance on a proposal by Travelers Insurance is unpersuasive because it is not clear what elements of that plan were adopted by the defendants.

111–15, 109 S.Ct. 948 (where no evidence administrator had power to construe, no deference accorded).

According to the 1982 and 1984 SPDs, the 1982 plan agreement provided a target benefit of 10% of the first $400 of monthly compensation and 40% of monthly compensation in excess of $400. Def. Ex. E at 1; Def. Ex. D at 1. In 1982, the SPD indicated that this projected benefit

> will be based upon the employer's annual contribution at an assumed interest rate that will be determined by all cash values accumulated in the employee's account.... *The cost of your plan is as follows:* Three (3%) of the plan cost shall be provided by the participants, and the remainder provided by the Credit Union.

Def. Ex. E at 1 (emphasis added). In 1984, although no changes had been made to the underlying plan agreement, the Credit Union clarified the language of its SPD by stating that the projected benefit:

> will be based upon the employer's *and employee's* annual contribution at an assumed interest rate that will be determined by the value of the participant's account.... *The cost of your plan is as follows:* Three percent (3%) of their compensation shall be provided by the participants, and the remainder provided by the Credit Union.

Def. Ex. D at 1 (emphasis added). The Travelers Insurance adoption agreement

confirms that the 1984 SPD wording is more accurate, since it too indicates that mandatory employee contributions were 3% of compensation, not 3% of plan costs. Pl.Ex. 70 at 5.[3]

Based even upon this limited record, there can be no serious doubt that the contract contemplated that the mandatory 3% contributions would be applied toward the target benefit. This conclusion is clearly supported by the language of the 1984 SPD stating that the minimum projected benefit was calculated based on both sources of contributions and by the statement in both SPDs describing employee contributions as the "cost" of the plan to participants. In other words, participants had to make the 3% contribution in order to get the minimum target benefit.

## B. 1985 Plan

In reviewing the defendants' interpretation of the 1985 plan, the Court weighs the fact that the Credit Union faces a potential conflict of interest in interpreting provisions that determine its obligation to make additional contributions on behalf of employees. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Nevertheless, the Credit Union's construction of the 1985 plan is entitled to deference as a reasonable—in fact the most reasonable—interpretation of an ambiguous contract.[4] *Id.* at 111, 109 S.Ct. 948 (interpretation of trustee with power to construe ambiguous

---

**3.** The adoption agreement also states that employees may make an additional voluntary contribution of up to 10 percent of their compensation and notes that death benefits in the event that an employee dies before retirement will be supplemented by payment of death benefits attributable to the employee's own contributions. Pl.Ex. 70 at 5. However, no reference to the possibility of voluntary contributions in addition to the mandatory minimums appears in the SPDs until after the plan was amended in 1985. Def. Exh. F at 2.

**4.** The plaintiffs' argument that *Firestone* standards do not apply because this is an action brought under § 502(a)(3) of ERISA rather than § 502(a)(1)(B) are unavailing. 29 U.S.C. § 1132(a)(1)(B), (a)(3). Section 502(a)(3) offers individual equitable relief from breaches of fiduciary duty that § 502 "does not elsewhere adequately remedy," *Varity Corp. v. Howe*, 516 U.S. 489, 512, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996), but § 502(a)(1)(B) "specifically provides a remedy for breaches of fiduciary duty with respect to the interpretation of plan documents and the payment of

terms will not be disturbed if reasonable). In the 1985 plan agreement, Article V governs the contributions and calculation of the "anticipated retirement benefit" (defined target benefit). Articles VIII and IX governs voluntary employee contributions. Section 5.01 states: "[T]he Employer shall contribute ... in each Plan Year ... on behalf of each Participant, the amount which shall be sufficient to pay the actuarial cost ... of providing each Participant with an anticipated retirement benefit [a.k.a., the defined target benefit] in the amount as set forth in its Trust Agreement." Section 5.02 provides "To become a participant, each eligible employee must contribute for each plan year, an amount, if any, equal to 3% of his compensation." It also provides that the withdrawal of mandatory employee contributions subjects an employee to forfeitures unless the "employee is 50% or more vested in employer-derived amounts" or the employee repays the full amount of the withdrawal, defining the accrued benefit as "the benefit derived from the employer contributions as the total accrued benefit less the accrued benefit derived from mandatory contributions." Def. Ex. A at 12, § 5.02; *see also id.* at 31, §§ 12.02, 12.03 (describing the vesting schedule). The rest of Article V concerns the calculation of the "anticipated retirement benefit" and final benefits at retirement. *Id.* at 12, §§ 5.03, 5.04, 5.05.

Under Article VIII, in contrast, "[p]articipants are not required to make any

claims ... one that runs directly to the injured beneficiary." *Id.* (citing *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 144, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985)). As to the plaintiffs' argument that the defendants are not entitled to deference because their final ruling was handed down in contemplation of ongoing litigation, the Court notes that the ruling was consistent with the defendants' interpretation of the plan agreements for the last 20 years.

contributions under this Plan," but they may voluntarily contribute up to 10% of their annual compensation, and such amounts will be received into an "employee voluntary contribution account maintained in the participant's name in the trust." *Id.* at 18, §§ 8.01, 8.02. In contrast to the limited vesting and withdrawal rights specified for mandatory contributions under Article V, each participant has "a fully vested and non-forfeitable right in his [Article VIII] employee voluntary contribution account" and may elect to withdraw any and all funds from that account at any time, though not more frequently than once every three months. *Id.* §§ 8.04, 8.05. Article IX goes on to provide special terms for tax-deductible contributions of up to $2,000 per year, which are also "at all times ... fully vested and non-forfeitable." *Id.* at 20, §§ 9.01, 9.05.

■ The most reasonable way to construe these provisions together is that the target contribution amount needed to generate the "anticipated retirement benefit" will be derived both from the 3% mandatory employee contributions, § 5.02, and from other employer funds, § 5.01. Otherwise, there would be no reason to deal with employee contributions at all within Article V and no explanation for the difference in vesting and forfeiture provisions, since employee contributions under the plaintiffs' theory would have no relation to or effect upon the contributions needed to generate the anticipated retirement benefit.[5] The

5. The plaintiffs' arguments concerning the plan's record-keeping requirements do not change this conclusion. The plan required trustees to maintain records showing "the amounts of all Employer contributions made on his behalf pursuant to Section 5.01 the amounts of any Employee voluntary contributions pursuant to Subsection 5.02(a) made by each such Participant on his own behalf and also showing separately the manner in which all such amounts are credited." Def. Ex. A at 8, § 3.04. This provision is inherently am-

SPD written after the 1985 plan amendment is consistent with this interpretation, although the Court does not place significant weight on it given the availability of the 1985 plan agreement itself and the dispute over whether the SPD was distributed.[6]

## II. Plaintiff's Motion for Leave to Amend Complaint

 Plaintiffs seek to assert a new claim for violation of 29 U.S.C. § 1024(b)(4), which requires plan administrators to produce copies of "the latest updated summary plan ... description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated" upon written request of a participant or beneficiary. They argue that this statutory language entitles them to an itemization of the amounts contributed to each participant's account by the participant and the employer. This argument is not persuasive. Section 1024(b)(4) contemplates the copying of "formal or legal documents under which a plan is set up or managed." *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 653 (4th Cir.1996). Neither that language nor any other provision of the statute requires plan administrators to generate itemizations for individual plan participants and accounts under this section. The case law is split on whether

biguous because there is no subsection 5.02(a) and because it is missing words and/or punctuation. The plaintiffs argue that it refers to § 5.02 and demonstrates that employee contributions are not to be combined with employer moneys to generate the target benefit. However, these accounting provisions do not explain how the target benefit is derived. Moreover, § 5.02 concerns "mandatory" contributions, while § 3.04's "*any* Employee *voluntary* contributions ... made by each Participant on his own behalf" seems more consistent with the voluntary contributions specifically authorized in § 8.02.

even pre-existing actuarial reports required periodically by ERISA must be released under § 1024(b)(4). *Compare id.* at 655 (appraisal and valuation reports not encompassed within statute); *Board of Trustees of CWA/ITU Negotiated Pension Plan v. Weinstein*, 107 F.3d 139, 142–46 (2d Cir.1997) (same), *with Bartling v. Fruehauf Corp.*, 29 F.3d 1062, 1070 (6th Cir.1994) (actuarial valuation reports included).

An appropriate order accompanies this memorandum.

### *ORDER*

For the reasons set forth in the accompanying memorandum, it is this ____ day of March 2002,

ORDERED that defendants' motion for partial summary judgment [# 27] is **granted.** And it is

FURTHER ORDERED that plaintiffs' motion for partial summary judgment [# 12] is **denied.** And it is

FURTHER ORDERED that the parties appear April ____, 2002, at ____ for a status conference.

**6.** Just like the 1984 SPD, the post-amendment summary states that the projected benefit is "based upon the employer's *and employee's* annual contribution" and describes the "cost of your plan" as consisting of three percent of the participants' compensation, with the remainder provided by the Credit Union. Def. Exh. F at 1. Several paragraphs later, the SPD notes that participants also may make voluntary contributions of up to 10% of annual compensation. *Id.* at 2.