**Edward H. MATHEWS, individually and on behalf of all others similarly situated, Plaintiff–Appellant,**

v.

**SEARS PENSION PLAN and Sears, Roebuck & Company, Defendants–Appellees.**

**No. 97–2938.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 25, 1998.

Decided May 13, 1998.

Rehearing and Suggestion for Rehearing En Banc Denied June 26, 1998.*

* Hon. Joel M. Flaum did not participate in the consideration of the petition.

462

Paul E. Slater (argued), Sperling, Slater & Spitz, Chicago, IL, for Plaintiff–Appellant.

William A. Gordon (argued), Mayer, Brown & Platt, Chicago, IL, for Defendants–Appellees.

Before POSNER, Chief Judge, and WOOD, Jr., and DIANE P. WOOD, Circuit Judges.

POSNER, Chief Judge.

This is a class action under ERISA against Sears Roebuck's pension plan. It is brought on behalf of those employees of Sears who upon retiring received (between 1987 and 1994) a lump sum payout in lieu of an annuity. The determination of the lump sum required discounting to present value the future payments that the retiree would have received had he elected the annuity form of pension. Discounting requires the selection of a discount rate. The Pension Benefit Guaranty Corporation recomputes the applicable rate every month. Sears' unvarying practice during the period covered by the suit was to use the rate fixed by the PBGC for January 1 of the year of retirement, even though the plan itself provides that the applicable rate is the PBGC rate that would be used "as of the date of distribution," which the plan defines as the first day of the month following retirement.

■ The named plaintiff retired on May 15, 1991, so his date of distribution was June 1, 1991. The PBGC discount rate for June was 6.75 percent. Sears, however, as usual used the January 1 rate, which was 7.25 percent, and as a result gave the plaintiff a smaller lump sum (by $17,324) than if it had used the rate applicable to the date of distribution. It was smaller because the higher the rate used to discount future payments to present value, the lower that present value will be. A discount rate is the interest rate at which a present lump sum would grow to equal specified future payments. That growth will be more rapid, and hence the starting point (the lump sum) smaller, the higher the rate. For example, the present value of an annuity of $10,000 a year for 20 years is $124,622 at 5 percent, but at 10 percent it is only $85,136.

The district court certified a class consisting of all the Sears retirees who in the period embraced by the complaint would have gotten larger lump sums had the PBGC discount rate applicable to their date of distribution been used instead of the January 1 rate. But the court then granted summary judgment for Sears on the ground that use of the January rate did not violate the plan.

There is no suggestion that by its choice of the January 1 PBGC rate rather than the rate on the date of distribution Sears was trying to rip off anyone. On the contrary, over the period covered by the complaint interest rates generally were rising and as a result tended to be lower at the beginning of a year than at the end. So the use of the January 1 rate gave most retirees who elected a lump sum a larger amount than if Sears had followed the literal language of the plan—for remember that the lower the interest rate, the higher the present value of a stream of future entitlements.

The origin of the plan's language that is in issue ("as of the date of distribution"), and of the practice discrepant with that language, are remote from anything to do with the plan sponsor's wanting to reduce the retirement benefits paid out under the plan. In 1984 Congress required pension plans covered by ERISA to use interest rates published by the PBGC in calculating lump sum payouts. (The law has since been changed—the statute now requires the use of the interest rate on 30-year Treasury bonds, 26 U.S.C. § 417(e)(3)(A)(ii)(II)—but the change does not affect this suit.) Specifically it required the plans to use the PBGC rate "as of the date of the distribution [i.e., payout]." 26 U.S.C. § 417(e)(3)(B). The following year, however, the Treasury Department issued a temporary regulation which stated that a plan could use either the date of distribution or the first day of the plan year in which the employee retired. Treas. Reg. § 1.417(e)–1T(e)(i). (In its final form, the regulation added that "the plan must provide which date is applicable." We consider the significance of this addition at the end of our opinion.) Although this may seem a bold, or even an outrageous, interpretation of the phrase "as of the date of the distribution," the validity of the regulation is not questioned.

At the time the temporary regulation was promulgated, Sears' pension plan provided that the January 1 rate would be used to calculate lump sum payouts. But because

Sears (its people testified) wasn't certain that it wanted to continue using that date, it amended the plan, effective January 1, 1987, by replacing the January 1 rate with the language of section 417(e)(3)(B), thus creating the foundation for this lawsuit. Sears continued, however, without interruption or exception, to use the January 1 PBGC rate in calculating the lump sum payouts. And this method was clearly described in the summary plan documents furnished to all employees throughout the period. As far as appears, moreover, no one who retired during this period complained about the use of the January 1 rate.

At the end of 1994, Sears unilaterally amended the plan to reinsert January 1 in the place of the quotation from the statute. This action was possible because the plan allows Sears to amend the plan unilaterally, without consulting or getting the consent of any of the potential beneficiaries. And that is why the period covered by the suit ends on the last day of 1994. After that date, as until January 1, 1987—the beginning of the complaint period—there was no possible argument that the plan required the use of a date different from January 1 of the year of retirement.

■ The parties agree that the ordinary principles of contract interpretation govern the interpretation of pension plans covered by ERISA. Cases can easily be cited for this proposition. See, e.g., *Lynn v. CSX Transportation, Inc.*, 84 F.3d 970, 973 (7th Cir.1996); *Krawczyk v. Harnischfeger Corp.*, 41 F.3d 276, 279 (7th Cir.1994); *Burnham v. Guardian Life Ins. Co.*, 873 F.2d 486, 489 (1st Cir.1989). But like so many legal generalizations, this one requires qualification to be completely accurate. First, when the fiduciary aspects of a plan are in issue, the relevant principles are those of the law of trusts rather than the law of contracts. See, e.g., *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Second, the relevant principles of contract interpretation are not those of any particular state's contract law, but rather are a body of federal common law tailored to the policies of ERISA. *Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir.1997); *Swaback v. American Information Technologies Corp.*, 103 F.3d 535, 540 (7th Cir.1996); *Wegner v. Standard Ins. Co.*, 129 F.3d 814, 818 (5th Cir.1997); *Denzler v. Questech, Inc.*, 80 F.3d 97, 101 (4th Cir.1996). And third, when a case involves ERISA pension plans rather than ERISA welfare plans, the interpretive principles are also to be tailored to the distinctive characteristics of pension plans. See *Miller v. Taylor Insulation Co.*, 39 F.3d 755, 759 (7th Cir.1994); *Black v. TIC Investment Corp.*, 900 F.2d 112, 115 (7th Cir.1990); *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1299–1300 (6th Cir. 1991).

The third qualification is particularly important here. It is illustrated by the rule forbidding oral modifications of ERISA pension plans, *Cefalu v. B.F. Goodrich Co.*, 871 F.2d 1290, 1295–97 (5th Cir.1989), and cases cited there; see 29 U.S.C. § 1102(a)(1); cf. *Doe v. Blue Cross & Blue Shield United of Wisconsin*, 112 F.3d 869, 875–76 (7th Cir. 1997); *Miller v. Taylor Insulation Co., supra*, 39 F.3d at 759, a rule that is designed to protect the plan's solvency and that is not a part of the common law of contracts. E.g., *Mohr v. Metro East Mfg. Co.*, 711 F.2d 69, 72 (7th Cir.1983); *Xerox Financial Services Life Ins. Co. v. High Plains Limited Partnership*, 44 F.3d 1033, 1041 (1st Cir.1995); 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 7.6, p. 228 (1990).

A further illustration comes from the fact that pension plans are usually not negotiated. Although this is true of many other contracts as well (printed form contracts, sometimes called "contracts of adhesion," are as numerous as the grains of sand on a beach), the reservation in Sears' plan, a common reservation in such plans, of the right *unilaterally* to amend the plan underscores the degree to which this particular kind of contract goes beyond even "take it or leave it." The potential beneficiary, though not consulted or consenting, ordinarily is bound nevertheless by the amendment unless it violates a provision of ERISA, as by cutting down on his accrued rights under the plan (basically the value of his own monetary contributions). See 29 U.S.C. § 1054(g); see generally 1 Ronald J.

Cooke, *ERISA Practice and Procedure* § 4:43, pp. 4–168 to 4–169 (2d ed. 1996).

Our third illustration of the need to tailor the federal common law of contracts to the special characteristics of ERISA plans is the principle that the plan summary generally controls in the case of a conflict with the plan itself because the summary is what the plan beneficiaries actually read. See, e.g., *Fuller v. CBT Corp.*, 905 F.2d 1055, 1060 (7th Cir. 1990); *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1518–19 (10th Cir.1996); *Jensen v. SIPCO, Inc.*, 38 F.3d 945, 952 (8th Cir. 1994); *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 981–83 (5th Cir.1991); *Edwards v. State Farm Mutual Automobile Ins. Co.*, 851 F.2d 134, 136 (6th Cir.1988). In the case of an ordinary contract, the full text would presumably trump a summary, and reliance on the summary would thus be thought unreasonable, though we cannot find a case directly on point. Cf. *Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 103–04 (2d Cir.1985); *United Virginia Bank/National v. Best*, 223 Va. 112, 286 S.E.2d 221 (1982); *Green River Valley Foundation, Inc. v. Foster*, 78 Wash.2d 245, 473 P.2d 844, 847 (1970); 2 Farnsworth, *supra*, § 7.10a, p. 260.

In short, while the starting point in resolving an issue of interpretation of an ERISA pension plan is the general law of contracts, the ending point may be different if the general law doesn't fit the issue because of something either in ERISA or in the nature of a pension plan. See *Buckley Dement, Inc. v. Travelers Plan Administrators of Illinois, Inc.*, 39 F.3d 784, 789 (7th Cir. 1994); cf. *Free v. Briody*, 732 F.2d 1331, 1337–38 (7th Cir.1984).

The language of the Sears plan as it read during the period covered by the complaint is unambiguous in favor of the class, and ordinarily that would be the end of the analysis of a contract case. If a written contract is clear, that is, if reading it one doesn't sense any ambiguity, gap, or contradiction that makes one doubt one's ability to understand the contract merely by reading it, the court normally won't look further for evidence of meaning. This is the venerable "four corners" rule. Its purpose is to protect contracting parties from the uncertainty that would attend their obligations if a judge or jury were free to consider evidence that would contradict the terms of a written contract. *In re Envirodyne Industries, Inc.*, 29 F.3d 301, 305 (7th Cir.1994); *Continental Bank, N.A. v. Everett*, 964 F.2d 701, 705 (7th Cir.1992); *McAbee Construction, Inc. v. United States*, 97 F.3d 1431, 1435 (Fed.Cir. 1996). In such a regime all contracts would be revisable by judges and juries (in ERISA cases, just by judges, because there is no right to a jury trial in such a case, e.g., *Brown v. Retirement Committee of the Briggs & Stratton Retirement Plan*, 797 F.2d 521, 527 (7th Cir.1986); *Sullivan v. LTV Aerospace & Defense Co.*, 82 F.3d 1251, 1257–59 (2d Cir.1996); 2 Cooke, *supra*, § 8:15, pp. 8–84 to 8–85). The security that one seeks from having a written statement of one's legal rights and duties would be destroyed.

In limited circumstances, however, parties are allowed to present extrinsic evidence to demonstrate that although the contract looks clear, anyone who understood the context of its creation would understand that it doesn't mean what it seems to mean. This is the doctrine of extrinsic ambiguity. *Pierce v. Atchison, Topeka & Santa Fe Ry.*, 65 F.3d 562, 568 (7th Cir.1995); *Home Ins. Co. v. Chicago & Northwestern Transportation Co.*, 56 F.3d 763, 767–69 (7th Cir.1995); *Cole Taylor Bank v. Truck Ins. Exchange*, 51 F.3d 736, 737–38 (7th Cir.1995); *AM Int'l, Inc. v. Graphic Management Associates, Inc.*, 44 F.3d 572, 577 (7th Cir.1995). Properly limited, the doctrine fits single-employer ERISA pension plans, as has been held or assumed in cases in this and other circuits. *Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 565 (7th Cir.1995); *Bolton v. Construction Laborers' Pension Trust*, 56 F.3d 1055, 1059 n. 2 (9th Cir.1995); *Landro v. Glendenning Motorways, Inc.*, 625 F.2d 1344, 1352 (8th Cir.1980); cf. *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 608 (7th Cir.1993) (en banc) (plurality opinion); *id.* at 613 (concurring opinion). The qualifications "properly limited" and "single employer" must be emphasized. In *Central States, Southeast & Southwest Areas Pension Fund v. Gerber Truck Service, Inc.*, 870 F.2d 1148 (7th Cir.

1989) (en banc), we refused to allow an employer by a secret side agreement to limit the contributions that he was required to make to a multiemployer plan under the terms of the plan. For by limiting his contributions he would be burdening the other employer participants in the plan and maybe even jeopardizing the plan's solvency. See also *Dugan v. Smerwick Sewerage Co.*, 142 F.3d 398 (7th Cir.1998); *Black v. TIC Investment Corp., supra*, 900 F.2d at 115. Our analysis was based on the provisions and policies of ERISA relating to multiemployer plans. The present case does not involve a multiemployer plan, and anyway the doctrine of extrinsic ambiguity is invoked here to limit rather than expand the plan's obligations.

■ The general limitations of the doctrine are at least as important in cases involving ERISA pension trusts as in cases involving normal contracts. The most fundamental of these limitations is that to be admissible to establish an ambiguity, extrinsic evidence must be objective; that is, it must not depend on the credibility of testimony (oral or written) of an interested party—either a party to the litigation or (a natural extension, though one we cannot find a case discussing) an agent or employee of the party. *Unelko Corp. v. Prestone Products Corp.*, 116 F.3d 237, 241 (7th Cir.1997); *Pierce v. Atchison, Topeka & Santa Fe Ry., supra*, 65 F.3d at 568; *Home Ins. Co. v. Chicago & Northwestern Transportation Co., supra*, 56 F.3d at 768–69; *Cole Taylor Bank v. Truck Ins. Exchange, supra*, 51 F.3d at 737; *AM Int'l, Inc. v. Graphic Management Associates, Inc., supra*, 44 F.3d at 575–76. This limitation, without which it would be far too easy for a party to a contract to rewrite it in his favor after the fact, had been violated in the two cases that the plaintiff cites to us, *Central States, Southeast & Southwest Areas Pension Fund v. Central Cartage Co.*, 69 F.3d 1312 (7th Cir.1995), and *Central States, Southeast & Southwest Areas Pension Fund v. Joe McClelland, Inc.*, 23 F.3d 1256 (7th Cir.1994), in which extrinsic evidence—in both cases oral and self-serving—offered to create an ambiguity in an ERISA pension plan was not allowed. Moreover, these cases involved multiemployer plans, like *Gerber.*

See also *Dugan v. Smerwick Sewerage Co., supra.*

■ The limitation to objective evidence requires us to ignore three items of evidence tendered by Sears: testimony that the plan language was changed from January 1 to "date of distribution" because Sears hadn't made up its mind which date to use; testimony that the motivation for its deciding to stick with the January 1 rate was the cost of adapting Sears' data processing programs to enable Sears to change the interest rate used in its lump sum calculations monthly; and testimony that Sears understood the reference to "date of distribution" in the plan to mean January 1. An interested party may not by his oral testimony create an ambiguity in contractual language that seems clear. We add that the testimony that Sears could not have altered its programs to cope with a varying date is unbelievable, and at argument Sears' lawyer conceded that the plan could have hired out the relevant clerical tasks, albeit at some cost (of course).

■ But several other items of evidence were admissible to create an ambiguity because they did not require the trier of fact to credit oral testimony by an interested party. The first consists of the identity of language between the statute and the plan, together with the Treasury regulation that defines the statutory term "as of the date of the distribution" to mean (at the election of the pension plan) either on the actual date of distribution (that is, the date of payment of the lump sum to the retiring worker) or on January 1 of the plan year in which the distribution occurs. This convergence of statutory and regulatory language with plan language suggests that "date of distribution" as used in the plan is a term of art, that is, a term that has a technical legal meaning different from its ordinary meaning—a technical legal meaning that in this case encompasses the use of the January 1 rate. The statute and regulation are here being used as a kind of specialized dictionary to establish an objective meaning different from that in ordinary language. *In re Envirodyne Industries, Inc., supra*, 29 F.3d at 305.

Reinforcing this inference are the facts, also perfectly objective, that the summary plan documents consistently refer to the January 1 rate, that use of that rate was Sears' uniform practice, and that nobody complained during the period in which the critical language was in the plan. These items of evidence suggest that everyone concerned understood that the relevant date was January 1 even though the plan said "date of distribution." The second and third items constitute "course of dealing" evidence, conventionally admissible to show that a seemingly clear contractual provision is actually ambiguous, because the credibility of such evidence is not a function of the self-serving testimony of a party to the contract. *In re New Valley Corp.*, 89 F.3d 143, 149–50 (3d Cir.1996); *Smart v. Gillette Co. Long–Term Disability Plan*, 70 F.3d 173, 179 (1st Cir. 1995); *Restatement (Second) of Contracts* § 212 comment b, § 223 comment b (1981); 2 Farnsworth, *supra,* § 7.12a, pp. 279–80. As for the plan summary, it is written, unambiguous, a presumptively reliable guide to the contents of the plan itself, *Fuller v. CBT Corp., supra,* 905 F.2d at 1060; cf. *Butler v. Encyclopedia Brittanica, Inc.*, 41 F.3d 285, 290–92 (7th Cir.1994)—indeed a guide that would be given controlling weight if the shoe were on the other foot and the plaintiff were trying to use the summary as a more generous measure of his benefits than the plan and could show that he had reasonably relied on language in the summary that was inconsistent with the language of the plan. E.g., *Fuller v. CBT Corp., supra,* 905 F.2d at 1060.

In the usual suit on a written contract there is no trial, because the only evidence is the contract itself. When as in this case there is extrinsic evidence of contractual meaning as well, but that evidence is not disputed *in itself* although the inferences to be drawn from it are, the only issue for trial is the ultimate issue of what the contract means. The extrinsic evidence here consists of the Treasury regulation, the course of dealing, and the contents of the plan summary. None of these pieces of evidence is disputable; the only question is whether when weighed with the language of the plan they show that the plan bears the meaning that Sears claims it bears. In a jury case, that would be a question for the jury, *La-Salle National Trust, N.A. v. ECM Motor Co.*, 76 F.3d 140, 145 (7th Cir.1996); *In re Stoecker,* 5 F.3d 1022, 1030 (7th Cir.1993); *Coplay Cement Co. v. Willis & Paul Group,* 983 F.2d 1435, 1438 (7th Cir.1993); *Thomas v. Bakery, Confectionery & Tobacco Workers Union No. 433,* 826 F.2d 755, 764 (8th Cir. 1987), for with immaterial exceptions the jury is the finder of ultimate facts (or, as they are sometimes called, "mixed questions of fact and law"), such as negligence, as well as of primary facts, such as how fast the defendant's car was going. E.g., *Mucha v. King,* 792 F.2d 602, 605 (7th Cir.1986); *Middleton v. Reynolds Metals Co.,* 963 F.2d 881, 884 (6th Cir.1992); *United States v. Rule Industries, Inc.,* 878 F.2d 535, 542 (1st Cir.1989).

But because, as we said, there is no right to a jury trial in an ERISA case (the reason being that ERISA's antecedents are equitable, compare *Feltner v. Columbia Pictures Television, Inc.,* — U.S. —, 118 S.Ct. 1279, 140 L.Ed.2d 438 (1998)), and here no evidence besides that introduced at the summary judgment stage that the parties would be presenting at a trial, all the evidence bearing on the issue of contractual meaning was before the trier of fact at that stage. In these unusual circumstances, to remand the case for trial would be an empty formality; the result would be foreordained. 10A Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, *Federal Practice and Procedure* § 2720, p. 26 (2d ed. 1983). *Brotherhood Shipping Co. v. St. Paul Fire & Marine Ins. Co.,* 985 F.2d 323, 326–27 (7th Cir.1993), is not to the contrary. That case stands for the sound proposition that the mere fact that a case is not a jury case doesn't entitle the judge to try the case on summary judgment. Anglo–American law disfavors trial by affidavit. But here the exact same evidence was before the district judge at the summary judgment stage, and in the exact same form, that it would be if we remanded for trial. We don't see how he could reach a different conclusion.

The plaintiff has another string to his bow, however. He argues—in a departure from the normal case, in which the plan

beneficiary relies on the summary plan documents, which he read, rather than the plan itself, which beneficiaries rarely read—that Sears' workers should be entitled to rely on the language of the plan. He points out that it would be unrealistic to suppose that any member of the class was actually aware of the Treasury regulation that impressed on seemingly clear language an almost opposite meaning. And this is true. But he does not claim that he or any other member of the class actually relied on the language of the plan. Such a claim would be hard to take seriously. Workers rely on the summary plan documents, not on the bulky and legalistic plan itself.

 We thus have the unusual case in which a contract says X but means Y; one party does not know *why* it means Y—is not privy to the evidence (or to all the evidence) that establishes the real meaning—but is *told* (here in the summary plan documents) that it is Y, and is content because the difference between X and Y is immaterial at the time that he becomes a party to the contract, since he doesn't know when exactly he's going to retire or what the annual pattern of PBGC discount rates will be in the year of his retirement. We find nothing in the principles of contract law or the policies of ERISA or the peculiarities of pension plans to bar the application of the doctrine of extrinsic ambiguity, properly limited as we have said, to show that Sears' interpretation is correct. We cannot see how ERISA beneficiaries or anyone else within the protective sweep of the statute would be benefited by the adoption of principles of contractual interpretation so rigid and archaic as to permit the class to reap the pure windfall here sought to the potential prejudice of other beneficiaries. It is a windfall not only because the members of the plaintiff class did not rely on the interpretation on which the suit is based, but also because there is no way that Sears can recoup the millions of dollars ($52 million to be precise) in extra benefits that it paid to other plan beneficiaries because of the interpretation that the class is challenging.

One loose end remains to be tied up. The Treasury regulation required Sears to indicate in the plan itself that it was going to use the January 1 rate, and Sears failed to do this. But this is not a suit to enforce the regulation; and in fact the Internal Revenue Service has not penalized Sears for its oversight. If the violation of the regulation were somehow a breach of contract, it would be a purely technical breach, entitling the victims only to nominal damages, since it did no harm. (Remember that the violation was just failing to amend the plan; the failure caused no harm to anyone, because no one relied on the language that Sears in violation of the regulation failed to change.) But we do not think it was any kind of breach. There is no suggestion that by failing to amend the plan—which remember that Sears could do without consulting or getting the consent of any of the potential beneficiaries—which eventually it did do without fuss—Sears was trying to deceive or otherwise take advantage of anyone. Although there was evidence that Sears was trying to preserve flexibility, which has overtones of opportunism summarized in the phrase "studied ambiguity," *North Bank v. Cincinnati Ins. Cos.*, 125 F.3d 983, 986–87 (6th Cir.1997)—of Sears trying to preserve a right to jump whichever way minimized plan benefits—the fact is that Sears adhered steadily to the January 1 rate and as a result lost millions of dollars over the course of the period covered by the complaint.

AFFIRMED.