In the
United States Court of Appeals
For the Seventh Circuit

Nos. 00-2628 and 00-3348

Kevin Bock,

Plaintiff-Appellee,

v.

Computer Associates International, Inc. and
Platinum Technology, Inc.,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99-C-5967--Suzanne B. Conlon, Judge.

Argued February 12, 2001--Decided July 18, 2001

Before Cudahy, Rovner and Williams, Circuit
Judges.

Cudahy, Circuit Judge.  Kevin Bock sued
Platinum Technology, Inc. (Platinum) and
Computer Associates International, Inc.
(Computer Associates) for breach of a
severance pay agreement. The defendants
removed the case to federal court,
asserting that the agreement was part of
an employee benefit plan under the
Employee Retirement Income Security Act
of 1974, 29 U.S.C. sec. 1001 et seq.
(ERISA). The district court found in
favor of Bock, and the defendants appeal.

I.

Platinum and Computer Associates are
businesses that service computer networks
and sell software. Platinum employed Bock
as a salesperson from 1995 through 1999.
During that time, he repeatedly surpassed
his sales quotas and was ultimately
promoted to the executive position of
senior vice president of sales. His
compensation plan with Platinum consisted
of a base salary plus commissions; he did
not receive a yearly bonus. Bock's salary
for 1999 was $145,000, and his commission
from completed sales for 1998 was
$674,333. Bock testified that in 1998, he
was credited with $367 million in revenue
for the company.

In 1998, Platinum set up a severance pay program for its executives. An important purpose of the plan was to keep key employees working hard for Platinum in the face of rumors of a corporate takeover by another company. Under the agreement implementing the program, an employee covered by the program would receive severance benefits if his or her employment was terminated without good cause within two years of a corporate buyout. Larry Freedman, Platinum's general counsel, submitted the severance agreement carrying out the plan to employees for their acceptance and signature in fall 1998. The severance agreement, as submitted to Bock, provided that employees would receive "aggregate severance pay" consisting of a "bonus amount" added to twice the sum of their highest base salary plus their highest 12-month amount of  "incentive compensation." "Bonus amount" was defined as the remaining portion of an employee's expected yearly bonus. "Incentive compen sation" was undefined. Bock signed the agreement in September 1998.

Computer Associates acquired Platinum in the spring of 1999. As a result of the change in ownership, Bock's employment was terminated on June 7, 1999. Platinum later notified Bock that his severance benefits would consist of $290,000-- double his base salary of $145,000. (Because Bock earned no yearly bonus, he received nothing from the "bonus amount" portion of the severance plan.)

Bock sued to enforce the severance agreement as including commission income under the umbrella of "incentive compensation." He sought summary judgment, contending that the agreement unambiguously entitled him to severance pay equal to two times his base salary and commissions. He also claimed that Platinum was estopped to deny him additional severance pay, based on alleged oral representations about whether commissions were included in the severance pay calculation.

The district court, finding the term "incentive compensation" ambiguous, denied Bock's motion for summary judgment. Then, after a bench trial, the court found that Platinum's board of directors, in adopting the severance

plan, did not intend to include commission income in the "incentive compensation" portion of the severance agreement. This interpretation of the term "incentive compensation," the court concluded, was a reasonable one. First, the court concluded that it was "not unreasonable" for the term "incentive compensation" to be a reference to bonus alone. Second, it looked to the summary plan document to support the reasonableness of that interpretation. The summary states that the amount of the severance payment would be calculated "using the sum of base salary and bonus (in addition to making up a lost bonus opportunity)." The summary does not mention commissions (or "incentive compensation") at all. The district court, in addition, found that the company's decision to exclude commissions was not effectively communicated to the affected employees. Thus, Bock and at least one other participant in the plan questioned Freedman as to whether their commission income was included; Bock did so before signing the agreement. The district court concluded that Freedman, who had directed that all questions regarding the plan be submitted to him, gave answers in response to these questions that suggested, but did not state explicitly, that commission income wasincluded in the definition of "incentive compensation." See Tr. at 380–82. It thus found that Platinum had violated its fiduciary duty to Bock under ERISA to clearly disclose that exclusion. Consequently, the court reasoned, the defendants were estopped from denying payment of severance benefits that took Bock's commission into account when calculating severance pay. Bock was awarded a total amount of $1,909,550.97, consisting of benefits he had been denied, pre-judgment interest and attorneys' fees and costs.

II.

Platinum's severance payment plan is governed by ERISA and is properly subject to federal jurisdiction because it is an employee benefit plan, which the Supreme Court has defined as "benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligations." Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 11 (1987). This does not mean, however, that

the individual severance agreements are to be construed entirely under trust principles, as Platinum argues. Platinum seeks to accord great weight to its own alleged intent through application of the trust principle that the settlor's intent governs the interpretation of a trust agreement. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 112 (1989) (indicating the importance of the intent of the settlor in interpreting terms of trusts); Restatement (Third) of Trusts sec. 4 ("'[T]erms of the trust' means the manifestation of intention of the settlor . . . ."). But we are dealing here with severance agreements, contractual in form, conferring benefits on the employer as well as the employee and quite distinguishable from vested benefits under a pension plan. See Bidlack v. Wheelabrator Corp., 993 F.2d 603, 616 (7th Cir. 1993) (en banc) (plurality opinion) (Easterbrook, J., dissenting) ("Pensions vest by law . . . health and other welfare benefits are left to contract."); Taylor v. Continental Group, 933 F.2d 1227, 1232 (3d Cir. 1991) ("But trust law cannot be imported wholesale into the ERISA context. Severance plans are often similar to employment contracts, whose interpretation requires determining the intent of both contracting parties.").

It has been uniformly held that general principles of contract law--under the federal common law that guides interpretation of ERISA plans--are to be applied to the interpretation of the language of such severance agreements. See Anstett v. Eagle-Picher Indus., Inc., 203 F.3d 501, 503 (7th Cir. 2000) ("the claim for separation benefits [under this ERISA plan] is really a claim to enforce a contract") (citation omitted); Grun v. Pneumo Abex Corp., 163 F.3d 411, 419 (7th Cir. 1998) ("we construe [the severance compensation agreement] in accordance with the federal common law under ERISA and general rules of contract interpretation"); Collins v. Ralston Purina Co., 147 F.3d 592 (7th Cir. 1998); Murphy v. Keystone Steel & Wire Co., 61 F.3d 560 (7th Cir. 1995); Hickey v. A.E. Staley Mfg., 995 F.2d 1385 (7th Cir. 1993); Taylor, 933 F.2d at 1232-33.

Platinum argues that, because we are interpreting a plan under ERISA, the intent of the plan's settlor governs the

interpretation of the terms of the severance agreement. For this proposition, Platinum cites Firestone, in which the Supreme Court determined, inter alia, the appropriate standard of review of benefit determinations under ERISA. 489 U.S. at 104-05. The Court concluded there that, for actions under 29 U.S.C. sec. 1132(a)(1)(B) challenging benefit eligibility determinations, courts are guided by principles of trust law, which "make a deferential standard of review appropriate when a trustee exercises discretionary powers." Firestone, 489 U.S. at 111. However, unlike eligibility determinations in which an administrator is given the power to construe uncertain terms, or where a plan's terms give the administrator's eligibility determinations deference, where instead no discretion has been conferred, "other settled principles of trust law . . . point to de novo review of benefit eligibility determinations based on plan interpretations . . . ." Id. at 111-12. The Court concluded: "As they do with contractual provisions, courts construe terms in trust agreements without deferring to either party's interpretation." Id. at 112. Firestone clearly fails to provide support for Platinum's position that the intent of the settlor governs in the matter before us. It says nothing about applying the law of trusts to interpretation of simple contractual agreements governed by ERISA--including severance agreements.

Likewise, Hickey provides no assistance to Platinum. Platinum argues that Hickey, in which this court construed terms of a severance pay plan, demands that courts must rely on the intent of the plan's creator. See Hickey, 995 F.2d at 1389. But in that case, the plaintiffs failed to produce any evidence to refute the employer's interpretation of the plan terms; it was not the intent of the settlor, as such, that governed in opposition to some other intent. Instead, there was no evidence of any other relevant intent in the case. See id. at 1388. It is true that the opinion is peppered with language hinting that its task was to determine the "intent of the plan," but the ultimate conclusion rested on what was--in light of extrinsic evidence presented to explain an ambiguous term--"only one possible interpretation of the term 'participant.'"

Id. at 1392. The question was whether the employer's proposed interpretation of the plan language was unreasonably narrow in excluding the plaintiffs from the plan. There was no evidence of an employer's secret intent that was not clear to the plan participants; thus, the question was merely a matter of interpreting the employer's intent as understood by anyone who read the language of the plan. Hickey is further distinguished by the important fact that, as far as we can discern, the plan there was not submitted to the plaintiffs for signature--it was an employee welfare benefit plan but was not implemented by a contractual agreement.

Thus, we proceed to evaluate the agreement under general contract principles, without giving special weight to the intent of either party.

III.

The issue in construing Bock's severance agreement is whether the agreement included in its prescribed calculations the commissions that comprised a large part of Bock's total compensation. The answer to this question turns on the meaning of the term "incentive compensation." Bock claimed that the term included commissions. Platinum said it meant bonus. The district court ruled that both Platinum's and Bock's proffered meanings of this term were reasonable and, since a contract term capable of more than one reasonable meaning is ambiguous, see Central States, Southeast & Southwest Areas Pension Fund v. Kroger Co., 73 F.3d 727, 732 (7th Cir. 1996), the district court found that the severance agreement was ambiguous and the court turned to extrinsic evidence to establish meaning. The court concluded that "in the context of the agreement" the term "incentive compensation" was subject to more than one interpretation.

The district court erred in apparently finding intrinsic ambiguity in the language of the agreement. The term "incentive compensation," which is the operative term, considered within the four corners of the severance agreement, is not ambiguous. The issue of ambiguity here revolves around whether the term "incentive compensation" includes or excludes "commissions." Since under no theory that has been advanced do

"commissions" fail to share the characteristics common to all examples of the generic category, "incentive compensation," we can perceive no ambiguity in the use of the latter term. Ambiguity can be present only if it is reasonable to read "incentive compensation" as excluding commissions. There is nothing in the language of the agreement itself to make this a reasonable interpretation.

There is no evidence that the term "incentive compensation" had any special meaning to contradict its plain and ordinary meaning as reflected in the dictionary. Platinum general counsel Larry Freedman testified that, as far as he knew, the term "incentive compensation" had no defined content in the software industry. Tr. at 146. Outside the context of the severance pay program, "incentive compensation" did not have a pre-defined meaning for Platinum either, Freedman testified. Tr. at 64-65, 146. Far from undermining the unambiguous meaning that we have found for the term, we think that this testimony merely establishes that "incentive compensation" is not some term of art requiring departure from the plain dictionary definition.

In fact, although some authorities have questioned the efficacy of recourse in many cases to dictionaries, see 2 E. Allan Farnsworth, Farnsworth on Contracts sec. 7.10 at 275 (2d ed. 1998) (citing, inter alia, Giuseppe v. Walling, 144 F.2d 608, 624 (2d Cir. 1944) (L. Hand, J., concurring)), the question here involves a plainly descriptive term that lends itself straightforwardly to dictionary definition. Thus, "compensation" means "payment for value received or service rendered." Webster's Third New International Dictionary 463 (1981). "Incentive" means "serving to encourage, rouse, or move to action." Id. at 1141. Combining these two words means payments that serve to move the payee to increase his or her efforts or output. Incentive compensation is thus an umbrella term that includes, at least as relevant here, commissions and bonuses. It may also include, for example, for industrial workers, piecework compensation. Sales "commissions" are the paradigmatic form of incentive compensation for salespersons and, applying the plain and

ordinary meaning of words, "commissions" would necessarily be included in "incentive compensation" unless "commissions" were expressly excluded. Supporting the plain meaning of the term is the definition adopted by labor experts. The term "wage-incentive systems" has been defined as "a method of relating wages directly to productivity, e.g., a piecework system, with a fixed payment for each unit produced." Labor Relations Expediter 751:106 sec. 10 (BNA). Further, commission payments have been defined as "a simple form of incentive practice in the distribution industries." Id.

   This determination is reinforced by the merger clause in the severance agreement. Paragraph 10(e) of the agreement provides:

Subject to the rights, benefits and obligations provided for under any executive compensation . . . plan[ ] of the company, this Agreement represents the entire agreement and understanding of the parties . . . [and] . . . supersedes all prior . . . agreements . . . except as set forth under any executive compensation plan.

In this connection, Bock had a "compensation plan" that was revised on a yearly basis. The plan defined his compensation as a combination of base salary and "incentives" in the form of commissions. Platinum argues that this does not demonstrate that under the plan "incentive compensation" included commissions because that term itself does not appear in the compensation plan. This may be correct, but his compensation plan is certainly consistent with the plain meaning we have ascribed to the term "incentive compensation."

   Written contracts are presumptively complete in and of themselves; when merger clauses are present, this presumption is even stronger. See L.S. Heath & Son, Inc. v. AT&T Info. Sys., Inc., 9 F.3d 561, 569 (7th Cir. 1993) ("the presence of a merger clause is strong evidence that the parties intended the writing to be the complete and exclusive agreement between them"); Sunstream Jet Exp., Inc. v. International Air Serv. Co., Ltd., 734 F.2d 1258, 1265 (7th Cir. 1984) (noting under Illinois

law that "'if the contract imports on its face to be a complete expression of the whole agreement, it is presumed that the parties introduced into it every material item, and parol evidence cannot be admitted to add another term to the agreement'") (quoting Pecora v. Szabo, 94 Ill.App.3d 57, 63, 418 N.E.2d 431, 435–36 (1981)).

IV.

However, here we must find the term "incentive compensation" to be ambiguous based on extrinsic evidence, in spite of the merger clause. Extrinsic evidence can, in some circumstances, be admissible to establish an ambiguity when it is objective and does not depend on the credibility of the testimony of an interested party. See Mathews v. Sears Pension Plan, 144 F.3d 461, 467 (7th Cir. 1998). "'Objective' evidence is admissible to demonstrate that apparently clear contract language means something different from what it seems to mean . . . ." AM Int'l, Inc. v. Graphic Mgmt. Assoc., Inc., 44 F.3d 572, 575 (7th Cir. 1995). This is called the doctrine of extrinsic ambiguity, which allows the consideration of extrinsic evidence "to demonstrate that although the contract looks clear, anyone who understood the context of its creation would understand that it doesn't mean what it seems to mean." Mathews, 144 F.3d at 466 (citations omitted).

We do not mean to belittle the importance of the terms outlined in the original agreement. Under the objective theory of contract, agreements are generally analyzed in terms of the objective (plain and ordinary) meaning of the terms they contain. See 1 Farnsworth, Farnsworth on Contracts sec. 3.6 (2d ed. 1998); 2 Farnsworth sec. 7.9. This is the meaning that is ascribed to the promisor, and the meaning that creates an expectation in the promisee. Judge Learned Hand has instructed:

It makes not the least difference whether a promisor actually intends that meaning which the law will impose upon his words. The whole House of Bishops might satisfy us that he had intended something else, and it would make not a particle of difference in his obligation . . . . Indeed, if both parties severally

declared that their meaning had been other than the natural meaning, and each declaration was similar, it would be irrelevant, saving some mutual agreement between them to that effect. When the court came to assign the meaning to their words, it would disregard such declarations, because they related only to their state of mind when the contract was made, and that has nothing to do with their obligations.

Eustis Mining Co. v. Beer, Sondheimer & Co., 239 F. 976, 984-85 (S.D.N.Y. 1917). This is the staunchest objectivist stance, but even more lenient jurists agree that the fact that one party to the agreement intends that the terms have something other than their plain and ordinary meaning is irrelevant unless both parties share the same meaning, see 2 Farnsworth sec. 7.9 at 265-67; Restatement (Second) of Contracts sec. 201(1) (1981), or one party knew, or had reason to know, the meaning intended by the other party, see 2 Farnsworth sec. 7.9 at 268-69; Restatement (Second) of Contracts sec. 201(2). "[I]ntent does not invite a tour through [the plaintiff's] cranium, with [the plaintiff] as the guide." Skycom Corp. v. Telster Corp., 813 F.2d 810, 814 (7th Cir. 1987). See also Laserage Technology Corp. v. Laserage Laboratories, 972 F.2d 799, 802 (7th Cir. 1992) ("[W]hether [the parties] had a 'meeting of the minds' . . . is determined by reference to what the parties expressed to each other in their writings, not by their actual mental processes.").

That said, "the overriding purpose in construing a contract is to give effect to the mutual intent of the parties at the time the contract was made." Alliance to End Repression v. City of Chicago, 742 F.2d 1007, 1013 (7th Cir. 1984) (en banc). Thus, strong extrinsic evidence indicating an intent contrary to the plain meaning of the agreement's terms can create an ambiguity--provided that the evidence is objective./1 This is what happened here. Along with the severance pay agreement, Platinum submitted to its executives a one-page summary of the agreement to "explain to people what was included in the package . . . ." Tr. at 125 (Freedman testimony)./2 The summary was submitted simultaneously with the agreement to all

eligible employees. It indicated that the "amount of severance benefit" is calculated "using the sum of base salary and bonus, in addition to making up lost bonus opportunity." This document supports the notion that Platinum intended that "incentive compensation" meant "bonus." It explained:

The payout period for the salary component of the severance benefit program is . . . calculated using the sum of base salary and bonus (in addition to making up lost bonus opportunity). The amount of base salary and bonus is determined based on the maximum amount paid to the executive during any trailing 12 month period during the 36 months prior to the termination of employment.

Nowhere are commissions mentioned as part of the severance pay calculation. Thus, the summary plainly evinces Platinum's intent to exclude commissions (although the summary language does not expressly exclude commissions). More important, had Bock read the summary, he could potentially have known of Platinum's intent when he signed the agreement.

Summaries have an established significance in benefits cases:

Our third illustration of the need to tailor the federal common law of contracts to the special characteristics of ERISA plans is the principle that the plan summary generally controls in the case of a conflict with the plan itself because the summary is what the plan beneficiaries actually read.

Mathews, 144 F.3d at 466 (citations omitted). Because the summary has introduced an ambiguity into the term "incentive compensation," we are obliged to resolve that ambiguity--to determine the true meaning of the term in this context. We already know, from the district court's findings (which we choose not to disturb), that Platinum intended to exclude commissions. But Platinum's undisclosed intentions are not controlling. Thus, Platinum's persistent plea that it did not intend "incentive compensation" to include commissions is beside the point. The key here is whether both parties shared the same meaning for the term "incentive compensation," or whether Bock knew, or had reason to know,

Platinum's intended meaning. See 2 Farnsworth sec. 7.9.

The district court apparently did not attempt to resolve this ambiguity, but instead proceeded directly to the equitable reasons it might find in Bock's favor. Perhaps this is because the court accepted Platinum's argument that the intent of the settlor governs. But, as we have noted, the intent of the "settlor" does not govern the interpretation of this contract. Regardless of the reasons for the district court's conclusions, it never resolved the ambiguity created by the summary. Nor was the contract fully interpreted, except for the finding that ERISA principles required that Platinum be estopped to deny Bock's purported understanding of the agreement. On remand, the district judge therefore must now make findings on the question whether Bock knew, or had reason to know, Platinum's intent with respect to commissions (or shared Platinum's intent in this respect). The findings of the district court may be based either on evidence already received or on additional evidence to be adduced. We therefore must remand this case for that purpose.

We make this remand with several caveats. First, knowledge, or constructive knowledge, may not be based solely on the fact that Platinum furnished the summary. Bock testified under cross-examination that, although the summary clearly meant commissions were excluded, he could not recall when he first read it. Tr. at 293. For Bock was under no duty to read the summary, although the fact that Freedman invited employees' attention to it may be relevant. See Tr. at 77 (Freedman testimony). Further, even if the court were to determine that Bock had read the summary prior to signing the agreement, that fact supports, but does not mandate, a finding that he had reason to know Platinum's intent.

Second, other factors might shed light on the meaning of this now-ambiguous term. For example, Platinum has suggested that its interpretation of the agreement is supported by evidence that Platinum designed the severance program primarily for salaried managers who received bonuses, and not for commissioned

salespersons. Platinum suggests that within this context "incentive compensation" has a more restrictive meaning--one that excludes commissions. This sort of restrictive meaning could prevail if both parties intended that a term in a contract have a meaning other than its most plain and ordinary meaning. See Alliance to End Repression, 742 F.2d at 1013. Thus, interpreting a consent decree requires an understanding of the context in which the decree was entered. Cf. Alliance to End Repression, 742 F.2d at 1013 ("[C]ontext, in the broadest sense, is the key to understanding language."). But evidence of context is only of moment if both parties to the contract shared the special meaning imported by the context or if one party conferred a special meaning on language, and the other party knew, or had reason to know, the first party's special meaning.

Here, the only evidence in the record that Bock knew, or had reason to know, Platinum's intent--i.e., knew that the context of the document indicated that "incentive compensation" was directed at non-sales executives' bonuses, rather than at sales executives' commissions--is the fact that he questioned several persons about whether his commissions were included. Shortly after Bock received the agreement, in early September 1998, he called Freedman to ask what was included in the severance pay calculation. Bock testified that Freedman told him "yes, everything is included, Kevin, you're covered, everything is fine, and that was about the extent of the conversation." Tr. at 235. Bock then signed and returned the agreement. In May 1999, a few months after Computer Associates announced its intent to acquire Platinum, Bock became suspicious. Bock contacted Freedman, Executive Vice President of Sales Tom Slowey and President and Chief Executive Officer Andrew Filipowski to ask whether the severance pay calculation included commissions. However, these are not necessarily the actions of an employee who knew, or had reason to know, that "incentive compensation" did not include commissions. Absent additional evidence, it would be inequitable to regard an employee's simple search for reassurance as a sufficient basis for concluding that he shared his employer's intent. Such a

search for reassurance, however, if fortified by other evidence, might help support an inference of knowledge of the employer's intent.

As we understand the facts at this point, there is a likely sequence of events. Platinum intended to exclude commissions from the calculation of incentive compensation for sales executives and wanted to recognize only bonus (not generally or substantially applicable to salespersons). However, Platinum made an apparently egregious drafting error in preparing the agreement for presentation to Bock. Platinum made what can be described as a unilateralmistake in failing to exclude commissions. Platinum therefore may have created an expectation in Bock, which he acknowledged by signing the agreement. See 1 Farnsworth sec. 3.9./3 But we have no way of knowing the ramifications of these events without exploring Bock's understanding of them. We do not adopt the view (although we do not foreclose the possibility) that Platinum's drafting was intentionally misleading in its effort to avoid forthrightly delivering the bad news to the salespersons. We leave the district court free to make appropriate findings on this point.

V.

Bock prevailed in the district court because the court concluded that Platinum breached a fiduciary obligation to fully disclose the terms of the severance plan. The court concluded that "the legal principle remains under both contract and ERISA law that one cannot induce an employee to enter into an agreement without disclosing material facts." Tr. at 384-85. But the district court did not appear to consider whether, or to what extent, the summary may have put Bock on notice that commissions were not included in the severance plan. The alleged breach turns entirely on the question for which we are remanding to the district court: did Bock know, or have reason to know, that Platinum intended to exclude commissions? If he did, Platinum may be rescued from the plain and ordinary meaning of the severance agreement itself. If he did not, Bock may prevail as a matter of pure contract interpretation.

The district court ruled that Platinum was estopped from denying Bock the full severance benefits, defined as including commissions. The court reasoned that Freedman's assurances that "everything is included . . . you're covered" induced Bock to sign the agreement. However, Platinum correctly points out that ERISA estoppel claims require a plaintiff to show "(1) a knowing misrepresentation; (2) made in writing; (3) with reasonable reliance on that misrepresentation . . . (4) to [the plaintiff's] detriment." Coker v. Trans World Airlines, Inc., 165 F.3d 579, 585 (7th Cir. 1999). We need not consider all Platinum's objections to the district court's conclusion because one will suffice: Bock does not prevail on an estoppel theory because there was no showing of detrimental reliance. That element of the estoppel claim requires a showing of economic harm. See Shields v. Local 705, Int'l Brotherhood of Teamsters, 188 F.3d 895 (7th Cir. 1999); Panaras v. Liquid Carbonic Indus. Corp., 74 F.3d 786, 794 (7th Cir. 1996). Bock argues that his continuing in Platinum's employ when put at risk of termination by a threatened takeover is sufficient detrimental reliance. However, there has been no showing, for example, that Bock refused alternative employment on account of his belief in a generous severance provision. If Bock has additional evidence to proffer on this point or a related one on remand, the district court in its discretion may receive additional relevant evidence.


VI.

For the foregoing reasons, we VACATE and REMAND to the district court for further proceedings consistent with this opinion.

FOOTNOTES

/1 To be "objective," extrinsic evidence "must not depend on the credibility of testimony (oral or written) of an interested party-- either a party to the litigation or . . . an agent or employee of the party." Mathews, 144 F.3d at 467. Thus, the evidence "can be supplied by disinterested third parties: evidence that there was more than one ship called Peerless, or that a particular trade uses 'cotton' in a nonstandard sense." AM Int'l, 44 F.3d at 575. Summaries of benefits plans appear to meet this criterion. See Mathews, 144 F.3d at 468.

/2 To preclude consideration of the plan summary under the present circumstances, the merger clause would presumably have had to explicitly exclude the summary. It did not.

/3 Farnsworth illustrates the doctrine of unilateral mistake well:

[S]o complete is the acceptance of the objective theory that courts unhesitatingly allow recovery for loss of expectation if one party has simply made a mistake in the use of language. If a seller misspeaks and offers to sell "two hundred fifty" bushels of apples at a stated price, meaning to say "two hundred fifteen," a buyer that accepts, neither knowing nor having reason to know of the seller's mistake in expression, can recover for loss of expectation should the seller fail to deliver 250 bushels.