**INDIANAPOLIS AIRPORT AUTHORITY, Plaintiff–Appellant,**

v.

**TRAVELERS PROPERTY CASUALTY CO. OF AMERICA, Defendant–Appellee.**

No. 16-2675

United States Court of Appeals, Seventh Circuit.

Argued December 9, 2016

Decided February 17, 2017

Jenny R. Buchheit, Rebecca J. Seamands, Nathaniel M. Uhl, Attorneys, Ice Miller LLP, Indianapolis, IN, for Plaintiff–Appellant.

Michele A. Chapnick, Alan G. Gregory, Attorneys, Gregory & Meyer P.C., Troy, MI, for Defendant–Appellee.

Before WILLIAMS and HAMILTON, Circuit Judges, and CHANG, District Judge.*

HAMILTON, Circuit Judge.

In this diversity-jurisdiction case, the Indianapolis Airport Authority sued Travelers Property Casualty Company of America over Travelers' partial denial of a claim for coverage arising from an airport construction accident that occurred in 2007. On motions for summary judgment, the district court interpreted the insurance contract in favor of Travelers on several issues. Following summary judgment, the Airport Authority's case was narrowed to a claim for unreimbursed inspection costs associated with the incident. Then, two weeks before trial was set to begin on that claim, the district court entered an evidentiary order that effectively precluded the Airport Authority from proving that sole remaining claim. The Airport Authority sought entry of final judgment so that it could appeal, and the district court entered judgment in Travelers' favor. On the Airport Authority's appeal, we affirm in part and reverse in part the district court's summary judgment order, and we vacate the evidentiary order for further consideration in light of this opinion.

I. *Factual and Procedural Background*

Plaintiff Indianapolis Airport Authority owns and operates the Midfield Terminal, a passenger terminal that opened for business on November 11, 2008. The Midfield Terminal project cost over $1 billion—and like any project of such magnitude, it had its share of setbacks. In January 2007, two shoring towers were being used to lift steel trusses to the roof of the terminal. Those shoring towers failed, causing a portion of the terminal's roof structure to drop by

about twelve inches. As a result of that "Shoring Tower Incident," work on the terminal stopped temporarily. The Airport Authority incurred millions of dollars in inspection and repair costs, as well as ancillary costs traceable to the incident. Yet despite the setback, the project remained largely on schedule. Before the Shoring Tower Incident, the terminal had been scheduled to open for business on September 28, 2008. It ultimately opened 44 days later, on November 11, 2008.

Construction of the Midfield Terminal project was insured by a commercial inland marine policy underwritten by defendant, Travelers. Unlike most insurance policies for consumers, the policy was not a boilerplate contract of adhesion but was instead a customized policy negotiated by the parties. The policy included three categories of coverage at issue in this litigation: (1) builders' risk (the "General Coverage Provision"); (2) soft costs (the "Soft Cost Provision"), particularly bond interest in excess of the budgeted amount; and (3) expenses to reduce the amount of loss, known a little awkwardly as ERAL (the "ERAL Provision"), an additional coverage feature that paid for certain expenses incurred by the Airport Authority to reduce delay and mitigate soft costs. The policy also included other coverages and coverage extensions that are not at issue here. We have considered the breadth and complexity of the policy in evaluating the scope of the provisions that are at issue, particularly the General Coverage Provision.

In 2008, the Airport Authority provided Travelers with a tentative proof of loss statement for the Shoring Tower Incident. It submitted a revised, sworn proof of loss statement in 2012. In its proof of loss, the Airport Authority identified a total claim

---

* The Honorable Edmond E. Chang, United States District Judge for the Northern District of Illinois, sitting by designation.

of approximately $12.8 million, less $3.6 million in payments that Travelers had already made. Following further adjustments by the Airport Authority and some additional payments by Travelers, the insurance company rendered a final claim decision in July 2013, leaving the Airport Authority with a non-covered loss of a little over $9 million exclusive of any soft costs.

The Airport Authority then sued, alleging that Travelers breached its contract and seeking a declaratory judgment on the extent of coverage and the parties' rights and obligations under the policy. After discovery, the parties filed cross-motions for summary judgment. The district court denied the Airport Authority's motion and granted Travelers' motion in large part. The court construed the General Coverage Provision narrowly, and it held that the Airport Authority was not entitled to soft costs or ERAL coverage. See *Indianapolis Airport Authority v. Travelers Property Casualty Co. of America*, 178 F.Supp.3d 745, 764–65 (S.D. Ind. 2016).

As a practical matter, after the district court's summary judgment order, only one aspect of the Airport Authority's non-covered loss remained for trial: its claim for around $2 million in inspection costs under the General Coverage Provision. Shortly before trial was scheduled to begin, however, Travelers moved to exclude opinion testimony by two key witnesses whom the Airport Authority had designated as hybrid fact/expert witnesses pursuant to Federal Rule of Civil Procedure 26(a)(2)(C). The district court restricted the subject matter about which those hybrid witnesses might testify while also holding that the Airport Authority would have to prove its damages with expert testimony. See *Indianapolis Airport Authority v. Travelers Property Casualty Co. of America*, No. 1:13–cv–01316–JMS–MPB, 2016 WL 2997506, at *10, 13–14 (S.D. Ind. May 23, 2016). That ruling proved fatal to the Airport Authority's remaining claim because it had designated no damages expert. The Airport Authority therefore moved for entry of final judgment, reserving its right to appeal the adverse rulings. The district court entered final judgment in Travelers' favor.

On appeal, the Airport Authority challenges both the district court's summary judgment order and its order on Travelers' motions to exclude. With respect to the summary judgment order, we agree with the district court's construction of the General Coverage Provision. We also agree that the Airport Authority has no compensable soft cost claim because of the deductible. However, we disagree with the district court's conclusion that the policy's ERAL Provision was not triggered. If the Airport Authority can demonstrate with competent evidence that it incurred expenses to reduce soft costs for which Travelers otherwise would have been liable, it may recover those expenses under the ERAL Provision, subject to policy limits. With respect to the district court's evidentiary rulings, we think it best to vacate those rulings for the court's reconsideration in light of our analysis concerning the scope of insurance coverage and the topics for trial. We provide some guideposts for the court and the parties on remand.[1]

1. Travelers filed a cross-appeal, No. 16-2847, contending that the district court erred in failing to grant its summary judgment motion in its entirety. We dismissed that cross-appeal in a September 13, 2016 order, explaining that a "cross-appeal is necessary and proper only when a party wants the appellate court to alter the judgment (the bottom line result, not the grounds or reasoning that led to the judgment)." Travelers received everything that it could hope for in the district court—the dismissal of the action against it. The

## II. The Scope of Coverage

### A. Legal Standards

■ We review *de novo* the district court's decision on the parties' cross-motions for summary judgment, construing all facts and drawing all reasonable inferences in favor of the party against whom the motion under consideration was filed. *Hess v. Board of Trustees of Southern Illinois University*, 839 F.3d 668, 673 (7th Cir. 2016).

■ The parties agree that Indiana law governs our interpretation of the insurance policy at issue here. In Indiana, insurance policies are generally subject to the same rules of construction that apply to other types of contracts. *Frye v. Auto–Owners Ins. Co.*, 845 F.3d 782, 788 (7th Cir. 2017), citing *Justice v. American Family Mutual Ins. Co.*, 4 N.E.3d 1171, 1176 (Ind. 2014). In determining the meaning of policy provisions, we "consider all of the provisions ... and not just individual words, phrases, or paragraphs. Thus, the insurance policy must be construed as a whole." *Burkett v. American Family Ins. Group*, 737 N.E.2d 447, 452 (Ind. App. 2000) (citations omitted). "If the policy's language is clear and unambiguous, it is to be given its plain and ordinary meaning." *National Fire & Casualty Co. v. West ex rel. Norris*, 107 F.3d 531, 535 (7th Cir. 1997). A special rule of construction applies, however, when an insurance contract contains ambiguous language: such language must be "construed both to favor the insured and to further indemnity." *Id.*

### B. The General Coverage Provision

■ The policy's General Coverage Provision stated that Travelers would pay for

"loss" ("accidental loss or damage") to "Covered Property" from any "Covered Causes of Loss." The term "Covered Property" was defined as "Builders' Risk," which was further defined as property described in the policy declarations and consisting of "Buildings or structures including temporary structures" and "Property that will become a permanent part of the buildings or structures." [2] The term "Covered Causes of Loss" was defined as the "RISKS OF DIRECT PHYSICAL 'LOSS.'" A separate but related provision appearing in the policy's general conditions, which the parties refer to as the "Valuation Condition," explained that property value at the time of loss was the lesser of (1) its actual cash value, (2) the cost of reasonably restoring the property to its pre-loss condition, or (3) the cost of replacing the property with substantially identically property.

The district court held that the General Coverage Provision was unambiguous and that it covered only "direct physical damage caused by the Shoring Tower Incident" and the "cost of reasonably restoring the damaged property to its condition immediately before the Shoring Tower Incident." *Indianapolis Airport Authority*, 178 F.Supp.3d at 764. We agree with that interpretation.

The Airport Authority argues that, because the General Coverage Provision defined the covered causes of loss as the *risks* of direct physical loss, that coverage must extend beyond mere physical damage. The Airport Authority's argument fails to appreciate that "Covered Property" was limited to "Builders' Risk," i.e., build-

arguments it asserted in the cross-appeal could be offered as alternative grounds to affirm the judgment.

**2.** The declarations further define Builders' Risk as "ALL PHASES PER SCHEDULE ON FILE WITH US OF NEW MIDFIELD TERMINAL PROJECT AT THE INDIANAPOLIS INTERNATIONAL AIRPORT."

ings and structures. In other words, the General Coverage Provision pays only for accidental loss or damage (resulting from a covered cause of loss) *to* physical structures. Direct repair costs would count, as would inspection costs associated with direct repair. But the economic and consequential costs that the Airport Authority describes in its operative Second Amended Complaint (which include costs of resequencing and accelerating different construction tasks, costs to resolve change orders and contractor claims, and overtime expenses to minimize delays) are *not* included under general coverage. That is not to say that these consequential costs are necessarily excluded from all coverage: they may qualify under one of the policy's additional coverage provisions, such as the ERAL Provision discussed below. But they are not compensable under the General Coverage Provision. On the contrary, the policy's exclusions section stated that "loss" (as the term is used in the General Coverage Provision) did *not* include damages resulting from "Delay, loss of use or loss of market." See *One Place Condominium, LLC v. Travelers Property Casualty Co. of America*, No. 11 C 2520; 2015 WL 2226202, at *5 (N.D. Ill. Apr. 22, 2015) ("[W]hile the insured may recover the entire cost . . . to repair the damage to the property itself . . . if that damage resulted in increased material and labor costs to construct the remainder of the project . . . there is only limited [additional] coverage . . . .").

In arguing for a more expansive understanding of the General Coverage Provision, the Airport Authority cites treatises saying that general coverage ordinarily applies to "direct physical loss" only. The Airport Authority also cites a more recent version of Travelers' form policy, which now states that Travelers will pay for "direct physical loss of or damage to Covered Property." The Airport Authority describes the differences between the General Coverage Provision and the comparable provisions in these extrinsic sources as "significant and material." We cannot rely on extrinsic sources because the operative language in the General Coverage Provision is unambiguous. See *AM General LLC v. Armour*, 46 N.E.3d 436, 440 (Ind. 2015) ("Clear and unambiguous terms in the contract are deemed conclusive, and when they are present we will not construe or look to extrinsic evidence, but will merely apply the contractual provisions.") (citation omitted). While the newer Travelers language is even clearer than the version in the Airport Authority policy, the latter is sufficiently clear to enforce as written in this case.

The Airport Authority also challenges the district court's reliance on the Valuation Condition to determine the scope of loss under the General Coverage Provision. According to the Airport Authority, the Valuation Condition "has no bearing on the amount of *loss* that is recoverable; rather, it solely addresses the *value* of . . . Covered Property." We doubt a property insurer would have any reason to value property apart from determining its obligations in the event of loss. The plain text of the Valuation Condition linked valuation to loss: "In the event of loss or damage, the value of property will be determined as of the time of loss or damage." The district judge correctly understood the Valuation Condition to provide a framework for computing insurance liability in just this situation, where the insured has sustained damage to the buildings and structures that constitute the insured Builders' Risk.

The Airport Authority's broad interpretation of the General Coverage Provision is inconsistent with the plain text of that provision. We agree with the district court that the General Coverage Provision covers only physical damage caused by the

Shoring Tower Incident and those expenses directly related to restoration of the damaged property.

### C. *Soft Cost Provision*

The policy's Soft Cost Provision stated that Travelers would pay for "soft costs" incurred during a "period of delay in completion." "Soft costs" were defined as those "actual and necessary business costs" (as shown in the policy declarations) that exceeded the "budgeted amount" for the project. The "period of delay in completion" extended from the "planned completion date" (that is, the date the project would have been "put into operation or use in the normal course of construction" if a covered loss had not occurred) to the date when the project "should be completed using reasonable speed and similar materials and workmanship." Soft cost coverage was limited to $100 million and subject to a 90-day deductible.

Although the policy declarations listed several categories of soft costs, only one category is at issue in this appeal: bond interest. Like many municipal construction projects, the Midfield Terminal was financed with revenue bonds. The Airport Authority issued four separate bond series. The terms provided that a portion of the bond proceeds sufficient to service interest during the construction period would be segregated in a capitalized interest account. After construction was complete and the airport was open for business, whatever funds remained in the capitalized account would be transferred to the Airport Authority's general construction fund, and the bond interest payments would be made with airport revenues.

Nobody disputes that the Midfield Terminal's opening day was delayed somewhat by the Shoring Tower Incident and that bond interest continued accruing during that period of delay. The Airport Authori-

ty's 2012 proof of loss identified a daily interest cost of $122,387.73. Since the terminal had been scheduled (prior to the Shoring Tower Incident) to open for business on September 28, 2008, and since it actually opened on November 11, 2008, the Airport Authority had to draw on the capitalized interest account to pay more than $5 million in bond interest that it had planned to service instead with airport revenues.

Nevertheless, Travelers argues—and the district court agreed—that the Airport Authority did not pay bond interest in excess of its "budgeted amount" and therefore could not recover a soft cost claim. The district court also agreed with Travelers that the soft cost claim was barred both because the Airport Authority failed to submit its claim in advance of this lawsuit (and so ostensibly violated its policy duties) and because the Airport Authority incurred no soft costs beyond the 90-day deductible window. We disagree with Travelers' position concerning the Airport Authority's "budgeted amount" of interest and its policy duties, but we agree that the deductible bars the Airport Authority from recovering any soft costs.

#### 1. *"Budgeted Amount"*

Travelers first argues that the Airport Authority cannot recover bond interest as a soft cost because it "never incurred even one dollar of [interest] in excess of its budgeted amount." As Travelers observes, the Airport Authority conceded it paid no surplus interest to bond holders beyond the amounts specified in the bonds' debt service schedules. That concession is hardly surprising. The debt service schedules plotted out the total interest to be paid annually during the life of each bond. That total interest was a function of the amount borrowed and the yield rates: it had nothing to do with the

success of the project, and it would not have been affected by even a much longer delay.[3]

■ But the policy's Soft Cost Provision did not depend on debt service schedules. It did not say that Travelers would cover only those interest payments exceeding the dollar amounts specified in the bond paperwork. Instead, it said that Travelers would pay for bond interest incurred during the period of delay in completion in excess of the "budgeted amount." That key term—budgeted amount—was not defined in the policy. We think the language sweeps more broadly than Travelers contends. The word "budget" implies an allocation of funds: money set aside for a particular purpose. The Airport Authority *budgeted* to pay its bond interest from its capitalized interest account until the Midfield Terminal was operational and began earning revenue, as planned for September 28, 2008. The Shoring Tower Incident delayed the terminal's opening date, so the Airport Authority was forced to dip more deeply into its capitalized account than it had planned. That unanticipated drawdown left the Airport Authority with less bond principal to spend on other endeavors. That was a soft cost under the policy.

No doubt, Travelers could have defined "budgeted amount" more narrowly. It could have defined the term to reflect only the actual dollar amount of bond interest paid, irrespective of source, as prescribed by the debt service schedules. But Travelers did not define the term. Its plea that we nevertheless adopt a narrow construction that favors it, the insurer, is contrary to Indiana law. See *Secura Supreme Ins. Co. v. Johnson*, 51 N.E.3d 356, 360 (Ind. App. 2016) (if insurer wanted court to at-

tach special requirement to contract term, it should have defined term accordingly).

Alternatively, even if we thought the term "budgeted amount" were ambiguous, we would then construe the term "both to favor the insured and to further indemnity," *West*, 107 F.3d at 535. In addition, evidence from the parties' negotiations during the underwriting stage, which remains under seal but which we have reviewed, shows that both parties intended that Travelers would cover bond interest in the event of a delay. Thus, even if we turned to extrinsic evidence to understand the meaning of "budgeted amount," we would still conclude that the Airport Authority's unplanned drawdown from its capitalized interest account was a soft cost under the policy.

### 2. *Policy Duties*

■ Travelers next argues that the Airport Authority breached its policy duties by failing to submit its soft cost claim and, indeed, by telling Travelers that it had no such claim. In making this argument, Travelers cites Section C of the policy's loss conditions, which required an insured, among other things, to give prompt notice of a loss event; to cooperate during the ensuing investigation; and to submit a sworn proof of loss statement upon Travelers' request. Nothing in Section C or in any other section of the policy specified that a proof of loss statement was a final document that could not be revised if new information surfaced. Likewise, nothing in Section C or in any other section of the policy required the insured to submit a final, integrated claim by a certain date. In this case, the Airport Authority submitted a proof of loss statement using Travelers'

---

**3.** The 2008 bond series differed from the other series in that it offered a variable interest rate and therefore did not include a comprehensive payment schedule. Still, the interest

payable on the 2008 bond series had nothing to do with project completion or project delay.

form, and it supplied extensive supporting documentation. We do not see how in so doing the Airport Authority breached a policy duty or failed to comply with a condition precedent to coverage.

The Airport Authority included with its proof of loss a calculation of the bond interest that it would have paid between September 29, 2008 (the day after the terminal's pre-loss scheduled opening date) and February 22, 2009 (the Airport Authority's post-loss projected opening date), though ostensibly to support its ERAL claim rather than a soft cost claim. The Airport Authority likewise attached its debt service schedules and bond documentation as exhibits to the proof of loss. Travelers asserts that an insurer is entitled to proof of loss to "put the insurer in possession of the facts upon which the insurer is to make its determination." True enough, but Travelers had the factual information it needed to determine whether the Airport Authority had a viable soft cost claim for bond interest.

 At the very least, the Airport Authority substantially complied with its duty to provide a sworn proof of loss, and substantial compliance is all that Indiana law requires. See *Indiana Ins. Co. v. Plummer Power Mower & Tool Rental, Inc.*, 590 N.E.2d 1085, 1089 (Ind. App. 1992); see also *Ebert v. Grain Dealers Mutual Ins. Co.*, 158 Ind.App. 379, 303 N.E.2d 693, 700 (1973) ("Where a policy provides for notice and proof of loss within a stated period, the insured must comply with that provision as a condition precedent to recovery

under the policy. However, the insured may show … a substantial compliance on his part with the condition.") (citations omitted). The substantial compliance doctrine makes good sense: a rule requiring strict compliance with the fine print buried in an insurance contract could result too easily in unintended forfeitures, which are anathema to the law. See *Gates v. Houston*, 897 N.E.2d 532, 536 (Ind. App. 2008), citing *Skendzel v. Marshall*, 261 Ind. 226, 301 N.E.2d 641, 644 (1973); see also *Travelers Ins. Cos. v. Maplehurst Farms, Inc.*, 953 N.E.2d 1153, 1164 (Ind. App. 2011) (May, J., dissenting). Because the Airport Authority complied with its policy duties, we do not address the question, debated at some length in the briefs, whether noncompliance may be excused if the insurer suffers no prejudice.

 Travelers alternatively contends that the Airport Authority waived its right to make a soft cost claim by saying in prelitigation correspondence that it had no such claim. Travelers' position is not persuasive. For a party to be bound by a waiver, the party must have had knowledge of and the intent to relinquish a particular right. *American Standard Ins. Co. of Wisconsin v. Rogers*, 788 N.E.2d 873, 877 n.4 (Ind. App. 2003). Here, the correspondence in which the Airport Authority purportedly "waived" its soft cost claim made clear that it declined to present such a claim only because it believed the 90-day deductible stood in its way.[4] The Airport Authority changed its position after litigation commenced: we see no rea-

---

**4.** In an August 17, 2012 letter, counsel for the Airport Authority wrote that the Airport Authority was "not making a soft cost claim per se, recognizing that the period of actual delay … was less than the 90 day deductible." Likewise, in an August 2, 2013 letter, counsel wrote that the Airport Authority had no plans to tender a soft cost loss to Travelers "because the policy provides that there is a 90

day deductible for soft cost losses." As discussed below, we agree with the Airport Authority's original understanding of the deductible: it did indeed bar the Airport Authority from recovering soft costs here. But nothing prevented the Airport Authority from arguing for a different understanding of the deductible in this lawsuit.

son why it was barred from doing so. Parties' legal theories frequently evolve both before and during litigation. The Federal Rules of Civil Procedure—which allow alternative and even inconsistent pleadings and take a permissive view of amendments—are drafted flexibly so parties may tailor their theories as they conduct discovery and learn more about the case. Even a sworn statement concerning the basis for a lawsuit by a party representative may not necessarily bind the party as the lawsuit proceeds. See *First Internet Bank of Indiana v. Lawyers Title Ins. Co.*, No. 1:07–cv–0869–DFH–DML, 2009 WL 2092782, at *4 (S.D. Ind. July 13, 2009), citing *A.I. Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630, 637 (7th Cir. 2001). If a party is not necessarily bound by its representations during litigation, we cannot understand why it should be bound by its informal representations prior to litigation—and Travelers cites no Indiana law that supports its aggressive waiver theory.

### 3. *Deductible for Soft Costs*

■ Although we reject Travelers' narrow construction of the term "budgeted amount" and its arguments that the Airport Authority breached its policy duties and waived its soft cost claim, we agree with Travelers and the district court that the 90-day deductible bars the Airport Authority from recovering any soft costs. The policy provided that Travelers would not pay soft costs until the deductible period expired and would then pay for only those soft costs incurred "in excess of such deductible, up to the Limit of Insurance."

Since the deductible was expressed in days rather than dollars, to apply the deductible we must determine the date on which the 90-day period began running. The policy specified that soft costs were payable during the "period of delay in completion," which began on the "planned completion date" and ended on the date the project should have been completed "using reasonable speed and similar materials and workmanship."

The Midfield Terminal project schedule did not define a "planned completion date." Instead, it projected both a "date of substantial completion" (July 24, 2008) and an "opening day" (September 28, 2008). After the Shoring Tower Incident, the construction manager estimated that with "reasonable speed and similar materials and workmanship" it could achieve substantial completion on December 16, 2008 and could open for business on February 22, 2009. The Airport Authority urges us to compute the "period of delay in completion" as running from the original to the revised dates of substantial completion. Under that approach, the deductible period would extend from July 24, 2008 until October 22, 2008. Since the Midfield Terminal did not actually open until November 11, 2008, the Airport Authority could then presumably recover the bond interest it incurred during the three weeks between the end of the deductible period and the date the airport opened.

The Airport Authority's preferred computation runs contrary to clear language in the policy. The policy defined "planned completion date" as the date the project "would be *put into operation or use* in the normal course of construction" if no loss had occurred. The phrase "put into operation or use" connotes opening day.[5] Prior to the Shoring Tower Incident, the airport was scheduled to open for operations on

---

**5.** The date the project would have been put into use was not the date of substantial completion. The Airport Authority's Rule 30(b)(6) witness testified: "There would be a number of things that would occur after the date of substantial completion," including "finishing work that would have to be done and systems put in place to make the airport operational."

September 28, 2008; following the incident, the construction manager planned for a February 22, 2009 opening. The 90-day deductible ran from September 28 until December 27. Assuming that the construction manager's post-loss projection was reasonable (a disputed point discussed below), the Airport Authority could recover soft costs it incurred between December 27 and February 22.

The problem is that the Airport Authority did not actually incur any soft costs between December 27 and February 22. Recall that the Midfield Terminal opened for business on November 11, 2008, well in advance of the construction manager's earlier projection. The only soft costs at issue in this case are the bond interest payments exceeding the amount the Airport Authority had budgeted to withdraw from its capitalized interest account. As of opening day, the fully operational airport provided revenues to service those interest payments. The Airport Authority has not identified any bond interest accruing after November 11, 2008 that it was forced to service through its capitalized account or through some other unanticipated means. Thus, the Airport Authority has no compensable soft cost claim.

We recognize that this result might seem harsh: after all, it appears that the Airport Authority managed to shave more than three months off its expected delay. To the extent the Airport Authority incurred additional costs in reducing that delay, it may be able to recover those costs as ERAL expenses, that is, expenses to reduce the amount of loss. But it cannot recover soft costs because it incurred no soft costs beyond the 90-day deductible window.

D. *ERAL Provision*

█ The policy's provision to cover expenses to reduce the amount of the loss,

known as the ERAL Provision, stated that Travelers would pay the Airport Authority's necessary expenses during the "post-loss period of construction" if the Airport Authority would not have incurred such expenses but for a covered loss that delayed completion beyond the planned completion date. However, Travelers would pay no more than the "amount by which such expense reduces the 'amount of loss' [Travelers] would have otherwise paid." "Amount of loss" was defined as the actual soft costs covered by the policy; the "post-loss period of construction" began on the date of loss and ended on the date the project should have been completed "using reasonable speed and similar materials and workmanship." In other words, the ERAL Provision paid for expenses incurred by the Airport Authority after a loss event to reduce the amount of soft costs (in this case, bond interest) for which Travelers would otherwise have been liable. This is a dollar-for-dollar reduction, and "[n]o deductible applies to this Additional Coverage."

The Airport Authority maintains that it incurred substantial costs to reduce the period of delay in completion. We can certainly believe it. After all, as noted above, the Airport Authority managed to open the Midfield Terminal more than three months before the opening date it had projected after the Shoring Tower Incident. It opened just 44 days after the pre-loss scheduled opening date, in spite of a construction failure requiring thorough inspections and millions of dollars in repairs. The Airport Authority submitted evidence that it "took measures and incurred costs in an effort to reduce the period of delay caused by the Shoring Tower Incident, including accelerating and resequencing the work." It submitted correspondence showing that Travelers had been hounding it to make all efforts to keep the project on

schedule. And the Airport Authority submitted a detailed breakdown of its incident-related costs, including roughly $4 million that it classifies as ERAL expenses.

Travelers argues, however, and the district court held, that because the Airport Authority has no compensable soft cost claim, it is entitled to no ERAL coverage. We believe this view misunderstands the interaction between these two forms of coverage. The ERAL Provision did not say that coverage turned on whether Travelers actually paid out a soft cost claim. Rather, ERAL coverage was to be triggered to whatever extent the Airport Authority accelerated or otherwise adjusted the project (at added expense) so as to mitigate Travelers' soft cost liability. The sole reason the Airport Authority cannot recover bond interest is because it completed the project before the 90-day deductible period expired. How did it accomplish this feat? A jury could find that it did so by incurring additional costs for resequencing and accelerating the project. This is precisely the situation in which ERAL coverage is appropriate—where, but for additional expenses incurred by the Airport Authority, Travelers itself would have been on the hook for soft costs.

Travelers' attempt to condition payment of ERAL expenses on payment of soft costs would create perverse incentives. A hypothetical illustrates the problem. If a loss event would have ordinarily delayed opening day by 150 days, but an insured managed to reduce the delay to just 100 days, the insured could recover ERAL expenses plus soft costs incurred during the ten days following the expiration of the 90-day soft cost deductible period. But if the insured worked even harder and managed to reduce the delay to 90 days, then under Travelers' view, the insured would be entitled to neither any soft costs nor any ERAL expenses. As Travelers would have it, the greater the effort, the less the reward. Travelers' rejoinder that the insured is obligated under the policy to mitigate its damages holds no water. An economically self-interested insured would have a powerful incentive to extend the delay period to just beyond the 90-day window.

Parties may, if they wish, agree with eyes wide open to contracts that create such seemingly perverse incentives or inefficiencies, but courts should require clear language before we conclude they have done so. See *Beanstalk Group, Inc. v. AM General Corp.*, 283 F.3d 856, 860–61 (7th Cir. 2002) (rejecting "blinkered literalism" that would produce nonsensical results under contract), and quoting *Rhode Island Charities Trust v. Engelhard Corp.*, 267 F.3d 3, 7 (1st Cir. 2001) ("There is a long tradition in contract law of reading contracts sensibly; contracts—certainly business contracts of the kind involved here—are not parlor games but the means of getting the world's work done.... True, parties can contract for preposterous terms. If contract language is crystal clear or there is independent extrinsic evidence that something silly was actually intended, a party may be held to its bargain, absent some specialized defense."); *Dispatch Automation, Inc. v. Richards*, 280 F.3d 1116, 1118–19 (7th Cir. 2002) (rejecting contract interpretation that would have given employee software developer an incentive to "pull his punches, or to quit the company if he thought he was on the brink of a breakthrough"). The plain language of this insurance policy does not suggest that the parties agreed to such counter-intuitive terms as Travelers argues here.

We conclude that the Airport Authority is entitled to bring its ERAL claim before a jury. We express no view on the dollar value of the claim: that will be for the jury to sort out. The jury must also

determine the post-loss date on which the airport would have been completed "using reasonable speed and similar materials and workmanship." The Airport Authority's construction manager thought that date was February 22, 2009. However, Travelers' damages consultant opined (based on an alternative schedule prepared by Travelers' structural engineer) that the "theoretical date on which Opening Day would have happened using reasonable speed and similar materials and workmanship . . . would have been on 11/2/08." If Travelers' consultant is correct, then the Airport Authority would seem not to have any compensable ERAL claim, since—regardless of any acceleration—it would have completed the project within the deductible window. But that dispute cannot be resolved as a matter of law at summary judgment or on appeal. It is a disputed question of fact.

III. *Order on Travelers' Motions to Exclude*

After the summary judgment decision, the Airport Authority's sole remaining claim was through the General Coverage Provision as construed narrowly by the district court. Soft costs and ERAL expenses were off the table. The Airport Authority had at one point alleged that it was still due nearly $4 million in inspection costs, attributable mainly to work performed by a firm called KCE Structural Engineers, P.C. After the summary judgment decision, the Airport Authority represented that it would seek "approximately $2,422,233.03 net of the $432,600.00 already paid by Travelers for engineering work." It planned to proceed to trial on that claim.

Long before the district court ruled on summary judgment, the Airport Authority had designated two hybrid fact/expert witnesses to testify concerning, among other things, the costs the Airport Authority incurred as a result of the Shoring Tower Incident. One was Richard Potosnak, principal in charge of Aviation Capital Management and Transportation Consulting & Management, the entities that served as the owner's technical representative on the Midfield Terminal project. The other witness was Mark Flandermeyer, project manager for Hunt/Smoot, a joint venture that served as construction manager on the project. While the parties' cross-motions for summary judgment remained pending, Travelers moved to exclude substantial portions of opinion testimony that it anticipated Potosnak and Flandermeyer would present at trial. The district court then ruled on summary judgment before the Airport Authority responded to those motions to exclude. Those response briefs, as well as Travelers' reply briefs and the district court's eventual exclusion order, narrowly focused on the question whether Potosnak and Flandermeyer could testify about KCE Structural Engineers' billings and, in particular, about the portion of those billings directly allocable to restoration of the damaged property. The district court limited the scope of Potosnak's and Flandermeyer's opinion testimony while at the same time requiring the Airport Authority to prove its damages with expert testimony—a burden the Airport Authority could not carry because it had designated no damages expert.

The landscape of this litigation has now shifted, and the triable issues and available damages have expanded. As discussed above, in addition to direct repair costs and related inspection costs, the Airport Authority may recover its ERAL expenses, i.e., those expenses it incurred to reduce the soft costs for which Travelers would otherwise have been liable. The Airport Authority had no opportunity to address the testimony and other evidence it planned to present in support of its ERAL

claim, and the district court did not evaluate the Airport Authority's evidentiary basis for its ERAL claim. We think it best to vacate the exclusion order for fresh consideration in light of this opinion. On remand, the district court should be willing to reconsider any aspect of the prior order. The court may of course direct the Airport Authority to itemize whatever remaining expenses it plans to pursue, as well as the evidentiary support for each expense. The court may alternatively conclude that any remaining objections are better resolved on a point-by-point basis at trial rather than through a pretrial order.

While there is little to be gained from parsing all the details of the exclusion order and the parties' many arguments in relation to that order, we offer a few guideposts for remand. In doing so, we keep in mind that evidentiary rulings are generally reviewed deferentially for abuse of discretion. See *Griffin v. Foley*, 542 F.3d 209, 217–18 (7th Cir. 2008).

▮ First, we agree with the district court that Potosnak and Flandermeyer, both of whom have extensive personal knowledge of the Midfield Terminal project and the Shoring Tower Incident, may testify subject to the Federal Rules of Evidence concerning the facts they learned through their work on the project, including facts relating to the costs the Airport Authority incurred in relation to the incident. Much of this testimony would likely qualify as percipient/factual or lay opinion testimony. To the extent the testimony requires specialized knowledge, the Airport Authority identified Potosnak and Flandermeyer as hybrid fact/expert witnesses and filed disclosures and summaries pursuant to Federal Rule of Civil Procedure 26(a)(2)(C).

Subject again to the Federal Rules of Evidence, Potosnak and Flandermeyer may also testify concerning KCE's inspec-tion services, as well as that portion of KCE's total billings allocable to project restoration following the Shoring Tower Incident—but only to the extent that these witnesses acquired relevant personal knowledge while performing their project duties. We do not think that, simply because the Airport Authority did not explicitly refer to apportionment testimony in its Rule 26(a)(2)(C) disclosures, Potosnak and Flandermeyer are therefore barred from presenting such testimony.

The disclosures revealed that both witnesses would testify about the "costs incurred due to the Shoring Tower Incident" and, specifically, about the Airport Authority's "Schedule of Outstanding Construction Costs." Travelers had ample opportunity to depose these witnesses about their knowledge of KCE's services. Further, from the outset of this litigation, the Airport Authority had maintained a broad view of the coverage to which it was entitled. Only after the district court ruled on summary judgment did the Airport Authority realize its litigation strategy was no longer viable.

We do not fault the Airport Authority for what might otherwise be viewed as an eleventh-hour reconfiguration. After all, if it had prevailed on summary judgment, it would have had no reason to put on testimony directed narrowly to whether KCE's costs—as the district court put it—"related solely to reasonably restoring the property to its condition before the Shoring Tower Incident." *Indianapolis Airport Authority*, 2016 WL 2997506, at *10.

▮ Travelers chides the Airport Authority for failing to produce full-fledged expert reports under Rule 26(a)(2)(B). The Airport Authority was not required to produce such reports for its hybrid witnesses. See Fed. R. Civ. P. 26 advisory committee's note to 1993 amendment subdiv.

(a)(2) ("The requirement of a written report in paragraph (2)(B) ... applies only to those experts who are retained or specially employed to provide [expert] testimony ... or whose duties as an employee of a party regularly involve the giving of such testimony."); *Downey v. Bob's Discount Furniture Holdings, Inc.*, 633 F.3d 1, 6 (1st Cir. 2011) (witness whose opinion testimony arose "not from his enlistment as an expert but, rather, from his ground-level involvement in the events giving rise to the litigation" fell "outside the compass of Rule 26(a)(2)(B)"); see also *American Property Construction Co. v. Sprenger Lang Foundation*, 274 F.R.D. 1, 4–5 (D.D.C. 2011) (construction contractors could testify as hybrids concerning information they obtained and opinions they formed while performing construction tasks); *Beechgrove Redevelopment, LLC v. Carter & Sons Plumbing, Heating & Air-Conditioning, Inc.*, Civ. No. 07–8446, 2009 WL 981724, at *6 (E.D. La. Apr. 9, 2009) (architect, engineer, and accountants involved in renovation project could testify as hybrids based on their factual observations and professional analyses rendered during project).

Potosnak and Flandermeyer do not have carte blanche to testify at will about KCE's billings. As hybrid fact/expert witnesses, they must testify from the personal knowledge they gained on the job. That personal knowledge requirement may limit their testimony. Both witnesses suggested during their depositions that they may not possess the requisite knowledge (or that KCE's invoices may be so vague as to

make meaningful apportionment impractical), although some evidence indicates that Potosnak apportioned KCE's billings as early as 2008. The district court certainly may preclude these witnesses from testifying beyond the scope of facts they learned and opinions they formed during the course of their project duties. That said, the Airport Authority need not rely exclusively on Potosnak and Flandermeyer to prove its case. Simply because these witnesses may not be qualified to testify as to the ins and outs of insurance coverage, it does not follow that they are barred from presenting relevant testimony as to costs incurred and what those costs represent, provided that they know.[6]

Next, we agree with the district court that Potosnak and Flandermeyer may testify regarding "facts that may contradict the facts underlying Travelers' experts' opinions." *Indianapolis Airport Authority*, 2016 WL 2997506, at *8. These witnesses may also identify those aspects of Travelers' experts' opinions with which they disagree, provided that their disagreement is factual in nature and arises from their experience on the Midfield Terminal project (as opposed to information they learned solely through the claim adjustment process or in litigation). The district court is entitled to police this distinction and to preclude Potosnak and Flandermeyer from testifying as if they were retained experts. But a strict rule preventing these witnesses from identifying any factual disputes or contradictions—particularly where Travelers is on notice that such disputes exist—would further confound an already complex case.

---

**6.** We agree with the district court that Potosnak may not testify about the so-called "KCE Model" (a computer simulation model) or "KCE Document" (a diagram plotting out the locations of KCE's inspections). Potosnak had nothing to do with the creation of the KCE Model. And while he created the KCE Document, he did so years after he completed his services on the project, using KCE's inspection reports as his source material. At minimum, the district court did not abuse its discretion in excluding Potosnak's testimony about these exhibits, which is more in the nature of retained expert testimony rather than hybrid testimony.

■ Finally, we respectfully disagree with the district court's ruling that the Airport Authority *must* put on expert testimony to prove that its outstanding costs should be covered by the insurance policy. Expert testimony might be helpful, of course. The Airport Authority may come to regret its decision not to retain a damages expert, particularly if Potosnak and Flandermeyer prove unable to identify reliably the subset of KCE's billings attributable to the Shoring Tower Incident. But neither Travelers nor the district court has identified any principle of Indiana or federal law *requiring* a damages expert in a case like this one. On the contrary, Indiana courts have acknowledged that damages may be "proven by both expert and non-expert testimony." *Sony DADC U.S. Inc. v. Thompson*, 56 N.E.3d 1171, 1181 (Ind. App. 2016). Federal courts routinely permit the "owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert." Fed. R. Evid. 701 advisory committee's note to 2000 amendments; see also *Izynski v. Chicago Title Ins. Co.*, 963 N.E.2d 592, 599 (Ind. App. 2012) (expert testimony not required in case involving breach of real estate contract or condemnation proceedings; landowner may testify regarding value of land). That logic extends to witnesses like Potosnak or Flandermeyer, who were deeply involved in the events in question.

We accordingly AFFIRM IN PART and REVERSE IN PART the district court's order on summary judgment; we VACATE the district court's order on Travelers' motions to exclude; and we REMAND this case for further proceedings consistent with this opinion.